## A. H. BELO & COMPANY v. B. F. LOONEY.

### No. 2909.    Decided December 13, 1922.

### (246 S. W., 777.)

**1.—Libel—Statute—Public Officer.**

A publication which, by attacking the motives of a public officer in instituting proceedings by the State against certain corporations, contained language injuring his reputation and impeaching his honesty and integrity, was libelous on its face, within the terms of article 5595, Revised Statutes. (pp. 176-178).

**2.—Privileged Communication.**

The privilege extended by paragraph 4 of article 5597, Revised Statutes, of reasonable and fair comment on or criticism of official acts, does not enter into or affect the definition of libel contained in article 5595. If the publication is one pronounced a libel by article 5595, the privilege is one to be pleaded and proven as matter of defense. It was not necessary for plaintiff to prove that the publication was malicious, the allegations untrue in fact, or the comment or criticism unreasonable or unfair. In the absence

of such defense proof of the publication left nothing further at issue but the question of damages. (pp. 172-179).

### 3.—Same.

Attacks in a newspaper upon the motives and conduct of the Attorney-General in instituting proceedings against certain corporations, which are here considered, are held to constitute libel within the definition of article 5595, Revised Statutes. (pp. 178, 179).

### 4.—Comment and Criticism—Statement of Fact.

Comment and criticism on the acts of a public officer may deal with sarcasm and ridicule of the act itself; but an aspersive attack on the character of the officer or the ascribing of his act to base or corrupt motives becomes an imputation of fact, not comment thereon, of which the defendant must make proof in order to escape liability. (p. 176).

### 5.—Statutory Construction—History of Enactment.

The legislative history of the original bills and amendments thereto resulting in the enactment of the laws on the subject of libel (Rev. Stats., arts., 5595-5597) is reviewed as throwing light on the intention of the Legislature in their enactment. (pp. 177, 178).

### C.—Libel—Proceedings of Public Meeting.

The privileged publication of the proceedings of public meetings is limited to such as are organized and conducted for public purposes only; and as to these it does not extend to the publication (here resolutions of the Chamber of Commerce in a city) of proceedings charging a public officer with reprehensible purposes in instituting a prosecution. (pp. 178, 179).

Certificate of dissent from the Court of Civil Appeals for the Sixth District.

The majority and dissenting opinions are published in 246 S. W., 762.

*Terry, Caven & Mills, Dinsmore, McMahan & Dinsmore, W. L. Crawford* and *Muse & Muse,* for appellant.

The court erred in charging the jury in the second paragraph of the court's main charge, that it was their duty to assess damages for the plaintiff, under the evidence in this case, because the publications alleged in the plaintiff's petition are privileged and not actionable without proof of actual malice, and no actual malice has been shown by any evidence in this case. R. S. 1911, Art. 5597, Subd'v's 3 and 4; Guisti v. Galveston Tribune, 105 Texas, 497, 150 S. W., 874; Blum v. Kusenberger, 158 S. W., 779; Townshend on Slander and Libel (4th Ed.), pp. 502-503; Newell on Slander and Libel (2nd Ed.), p. 281; 25 Cyc., pp. 253, Note 32, 254, 255, 542 (II); Fry v. McCord, 95 Tenn., 678, 33 S. W., 568, and numerous authorities; Reid v. Providence Journal Co., 20 R. I., 120, 37 Atl., 637; McWilliams v. Worker's Printing Co., 174 S. W., 464 (Mo.); Diener v. Star-Chronicle Pub. Co., 132 S. W., 1143 (Mo.); Howe v. Thompson, 150 N. W., 301 (S. D.); Branch v. Knapp & Co., 222 Mo., 580; Greenwood v. Cobbey, 26

112 Tex.—11

Neb., 449; Barringer v. Sun Printing & Pub. Assn.; 145 N. Y. S., 776, on necessity of alleging special damages; Morrison v. Dean, 104 S. W., 505; Hirshfield v. Bank, 83 Texas, 452; Continental Natl. Bank v. Bowdre, 23 S. W., 131 (Tenn.); Terwilliger v. Wands, 17 N. Y., 54, 72 Am. Dec., 420; Fessinger v. El Paso Times Co., 154 S. W., 1171; Cotulla v. Kerr, 74 Texas, 89; Cook v. Globe Printing Co., 127 S. W., 332, 349-50 (Mo.); Gandia v. Pettingill, 222 U. S., 452.

A lawful occasion rebuts the presumption of malice and puts the burden on plaintiff to prove the publication was inspired by actual malice. McAllister v. Detroit Free Press, 76 Mich., 335; Briggs v. Garrett, 111 Pa. St., 404; Upton v. Hume, 24 Ore., 420; State v. Balch, 31 Kans., 465; Rude v. Nass, 79 Wis., 325; Ott v. Murphy, 141 N. W., 463; Wagner v. Scott, 164 Mo., 289; Klinck v. Colby, 46 N. Y., 427; Denver Public Warehouse Co. v. Holloway, 34 Colo., 432, 114 Am. St., 171; Lauder v. Jones, 13 N. D., 525, 101 N. W., 907; Bacon v. Mich. Cent. R. Co., 66 Mich., 166, 33 N. W., 181; Noonan v. Orton. 32 Wis., 112; Madill v. Currie, 134 N. W., 1004; Arnold v. Ingram, 138 N. W., 111; Schull v. Hopkins, 127 N. W., 550; Pokrok Pub. Co. v. Zizkovsky, 42 Neb., 64; Mott v. Dawson, 46 Ia., 533; Bays v. Hunt, 60 Ia., 251, 14 N. W., 785; State v. Burnham. 9 N. H., 34, 31 Am. Dec. 217; Carpenter v. Bailey, 53 N. H., 590; Briggs v. Garrett. 111 Pa., 404, 56 Am. Rep., 274; Press Co. v. Stewart, 119 Pa., 584. 14 Atl., 51; Jackson v. Pittsburg Times, 152 Pa., 406, 34 Am. St. Rep., 659; Myers v. Longstaff, 14 S. D., 98, 84 N. W., 233; Express Printing Co. v. Copeland, 64 Texas, 354; Shurtleff v. Stevens, 51 Vt., 501, 31 Am. Rep., 698; Posnett v. Marble, 62 Vt., 481, 11 L. R. A., 162; O'Rourke v. Lewiston Daily Sun Pub. Co., 89 Me., 310, 36 Atl., 398; Crane v. Waters (C. C.), 10 Fed., 619; Coleman v. MacLennan. 20 L. R. A. (N. S.), 361, 98 Pac., 281; Wilson v. Noonan, 35 Wis., 321.

*Yates, Sherill & Starnes, Crosby, Hamilton & Harrell,* and *Clark & Leddy,* for appellee.

The articles set out in appellee's petition clearly and plainly impute that appellee was actuated by wicked, corrupt and selfish motives in the discharge of his official duties as Attorney General, and hence are libelous. Art. 5595, R. S., 1911. Guisti v. Galveston Tribune. 105 Texas, 497, 150 S. W., 874; Belo v. Fuller, 84 Texas, 450, 19 S. W., 616; Cotulla v. Kerr, 74 Texas, 89; Mayo v. Goldman, 122 S. W., 450; Forke v. Homann, 14 Texas Civ. App., 670, 39 S. W., 210; Houston Printing Co. v. Moulden, 15 Texas Civ. App., 574, 41 S. W., 381; Galveston Tribune v. Johnson, 141 S. W., 302; San Antonio Light Pub. Co. v. Lewy, 52 Texas Civ. App., 22, 113 S. W., 574; Walker v. San Antonio Light Pub. Co., 30 Texas Civ. App., 165, 70 S. W., 557; 25 Cyc. sub-division d, p. 410; note 79, p. 402; sec. 2, p. 402; note 81, p. 403; p. 346; 18 Am. & Eng. Ency. of Law (2 Ed.), p. 949, and

authorities cited in note 1; Newell on Libel & Slander, p. 200 sec. 174; p. 212, sec. 184; Townshend on Libel & Slander (4 Ed.), p. 453; Clifton v. Lauge, 108 Iowa, 472; Wofford v. Meeks, 87 Am. St. Rep., 66, 55 L. R. A., 215; Towney v. Simonson, 27 L. R. A. (N. S.), 1035; Larrabee v. Minnesota Tribune Co., 36 Minn., 141; Kilgore v. Evening Star Newspaper Co., 96 Md., 16, 53 Atl., 716; Neeb v. Hope, 111 Pa. St., 145; Gove v. Blethen, 21 Minn., 80, 18 Am. Rep., 380; Leveret v. Daily States Pub. Co., 131 Am. St. Rep., 368; Bourreseau v. Detroit Ev. Journal, 63 Mich., 425.; Dauphine v. Buhue, 122 Am. St., 136; McGinnis v. Knapp & Co., 18 S. W., 1137; McAllister v. Detroit Press Co., 15 Am. St., 347.

The articles in question, when reasonably and fairly construed, clearly and plainly imputing evil and corrupt motives to appellee as a public officer in the discharge of his official duties, the court properly instructed the jury that the same were libelous. Cotulla v. Kerr, 74 Texas, 89; Belo v. Smith, 91 Texas, 225; Houston Printing Co. v. Moulden, 15 Texas Civ. App., 574, 41 S. W., 381; Galveston Tribune v. Johnson, 141 S. W., 302; Mitchell v. Spradley, 56 S. W., 134; Ledgerwood v. Elliott, 51 S. W., 872; Townshend on Libel & Slander, p. 502, sec. 281; p. 512, sec. 288, p. 528; Odgers on Libel & Slander, p., 98, sec. 105; Newell on Libel & Slander, p. 362, sec. 343; 25 Cyc., p. 530.

The court correctly held that the articles in question did not constitute reasonable and fair criticism of the official act of a public officer, because each of said articles charged that appellee, as an officer, was actuated in the discharge of his public duties by unworthy and improper motives in the filing and prosecuting of the Magnolia and Katy suits. Cotulla v. Kerr, 74 Texas, 89, 11 S. W., 1058; Houston Printing Co. v. Moulden, 15 Texas Civ. App., 574, 41 S. W., 381; Galveston Tribune v. Johnson, 141 S. W., 302; Newell on Libel & Slander, p. 230, sec. 174. p., 212, sec. 184, p. 211, p. 243. p. 362, sec. 341; Townshend on Libel & Slander (4 Ed.), p. 453, p. 477, sec. 252; 25 Cyc., p. 401, Subdivision d, note 79, p. 402, sec. 2, p. 346, note 81, p. 403; 18 Am. & Eng. Ency. of Law (2 Ed.), p. 949, and authorities cited in note 1; Forke v. Homan, 14 Texas Civ. App., 670, 39 S. W., 210; San Antonio Pub. Co. v. Lewy, 52 Texas Civ. App., 22, 113 S. W., 574; Wofford v. Meeks, 87 Am. St. Rep., 66, 55 L. R. A., 214; Larrabee v. Minnesota Tribune Co., 36 Minn., 141; Kilgore v. Evening Star Newspaper Co., 96 Md., 16, 53 Atl., 716; Neeb v. Hope, 111 Pa. St., 145; Gove v. Blethen, 18 Am. Rep., 380.

Appellant's answer to appellee's cause of action was insufficient to constitute a justification of the publications declared upon in that it did not plead the truth of the imputations naturally and fairly arising from the language of the several publications, and hence was insufficient to constitute any defense thereto and appellee's special ex-

ceptions were, therefore, properly sustained. Democrat Pub. Co. v. Jones, 33 Texas, 307; Dement v. Houston Pub. Co., 37 S. W., 985; 25 Cyc., pp. 460, 530, 546; 18 Am. & Eng. Ency. of Law, (2 Ed.), sec. 2, pp. 1069-1070; Newell on Libel & Slander, p. 793, sec. 791, p. 968, sec. 959, p. 792, sec. 1; Townshend on Libel & Slander (4 Ed.), p. 602, sec. 359, p. 311, sec. 212, and authorities cited in note 4; 3 Ency. of Pleading & Practice, p. 85; Odgers on Libel & Slander, p. 156, sec. 169; Rutherford v. Paddock, 91 Am. St. Rep., 295, and especially the extended note thereto; Ames v. Hazard, 8 R. I., 143; Jones v. Townshend, 21 Fla., 431; Royse v. Maloney, 57 Vt. 325; Nott v. Stoddard, 38 Vt., 25; Towney v. Hurley, 27 L. R. A. (N. S.), 1035; Downey v. Dillon, 52 Ind., 442; McLeod v. Crosby, 128 Mich., 641, 87 N. W., 883; Gault v. Babbitt, 1 Ill. App., 130; Smith v. Tribune Co., 4 Biss. (U. S. C. C.), 477; Whittemore v. Weiss, 33 Mich., 348; Palmer v. Smith, 21 Minn., 419.

The publication of the Corsicana resolutions was not privileged as a fair and reasonable comment and criticism of the official acts of appellee as Attorney General. It charged him with official misconduct and was libelous. This is too clear for argument. The meeting at Corsicana was not a public meeting, organized and conducted for public purposes only. Vernon's Sayles' Civ. Stats., Art. 5597; Sutton v. Belo & Co., 64 S. W., 686; Cotulla v. Kerr, 74 Texas, 78; 11 S. W., 1058; Ex Parte Looper, 134 S. W., 345, 27 Am. & Eng. An. Cases, 32; Belo & Co. v. Lacy, 111 S. W., 215; Criminal Code (1911), Arts. 1151, 1157, sec. 5; 9 Cyc., page 20; Bishop Crim. Law, sec. 216; Telegram Newspaper Co. v. Commonwealth, 70 Am. State Rep., 280; Percival v. State, 50 Am. St. Rep., 560, and notes, People v. Wilson. 16 Am. R., 528; Cooper v. People, 13 Col., 253-337, 84 Pac., 912; State v. Frew, 24 W. Va., 416, 49 Am. R., 257.

MR. JUSTICE McCARTNEY, delivered the opinion of the court.

This case comes to this Court upon a certificate of dissent from the Court of Civil Appeals for the Sixth District.

Appellee sued to recover damages on account of certain publications in the Galveston Daily News and the Dallas Morning News concerning two suits instituted by him while serving as Attorney General. The first three publications are short and will be copied in full. The last three are lengthy and we will shorten the opinion by stating briefly the substance of portions thereof and quoting only the most important parts thereof:

"I.   Editorial, published March 8, 1913.

"A careful reading of the petition filed by Attorney General Looney in his suit against several oil companies has failed to disclose any allegation that the oil business is monopolized either by these defendant companies or any other companies. Their chief offense seems to be that they have a blood relation to one another, or a financial

relation, with the Standard Oil Company as the grandfather of them all. Also they seem to be accused of having somehow parceled out the State among themselves, that is, to agree that one will not sell in a field occupied by another member of the family. If there is no monopoly of the oil business in this State, if, on the contrary, there is competition, whether among the members of this alleged Rockfellerian oil family, or among its members on the one side and oil companies of other breeding on the other—if, in short, there is competition and not monopoly in the oil-selling business of Texas, we can see no occasion whatever for the Texas antitrust law to become excited, much *less indignant. Maybe, if one could go deep enough, one would see that the grievance is, not that there is no competition, but that there is two much, wherefore the desirability of having the antitrust law drive some oil companies out of the State that the others may not be forced to lead so strenuous a life. There are nine ways to skin a cat and at least two uses to be made of an antitrust law.*

"II. Resolutions Corsicana Commercial Club, published March 27, 1913.

"Condemn Attorney General.

"Corsicana Commercial Club Protests against Prosecution of Magnolia and Corsicana Companies.

"Corsicana, Tex., March 25. — The Corsicana Commercial Club this afternoon adopted the following resolution:

"Be it resolved by the Commercial Club of the City of Corsicana:

"That we are committed to the enforcement of the laws of our State in a spirit of justness and fairness and will use our best efforts to secure the same.

"Be it further resolved that we express no opinion as to the guilt or innocence of the Magnolia Petroleum Company and the Corsicana Petroleum Company of the acts of which the Attorney General claims they are guilty.

"Be it further resolved, that we are not in sympathy with, but strongly condemn, the procedure of the State, through its Attorney General, in bringing said companies to trial. *It has the appearance of lynch law or of a mock trial where the only effort is to procure a place where injustice may be worked out.* It is not usual for an officer who is seeking to enforce the law to select an unusual and arbitrary place as a background for his act. It is not usual for a court to take from any citizen his property and put it in the possession of another without notice or a chance to be heard, but both of these things have been done and we view it as an assault on our most sacred right to an impartial and legal trial. The Magnolia Petroleum Company and the Corsicana Petroleum Company have transacted business among us for a number of years and are managed by men whom we know, respect and have confidence in;

they are our friends and neighbors and we mingle with them day by
day and their conduct inspires our respect and commands our con-
fidence. We can see no reason why the companies or their stock-
holders and officers should be subjected to such *unjust, unusual and
arbitrary treatment* that puts them to great costs, deprives them
of the control of their property and humiliates them before their
fellow citizens by prejudgment.

"The property of said companies is in Texas and gives employ-
ment to a number of our citizens; pays large taxes to our State, and
advances the interests of many people and the State, and we declare
that it should receive fair treatment when brought to the bar of
justice.

"We are unalterably opposed to such *unjust and reprehensible
legal proceedings* and we petition the Legislature of the State of
Texas to prevent by suitable legislation the appointment of re-
ceivers without notice and the power to bring suits in remote and
unusual places.

"III.   Article from 'Financial World' published April 10, 1913.

## "CRUSHING AN OIL COMPETITOR.

"Holland S. Reavis, editor of the Fuel Oil Journal of Houston,
Tex., *has made some significant revelations touching the motives
behind the latest suit brought in Texas to oust the Magnolia* Pe-
troleum Company from Texas.   The suit was brought under the
antitrust laws of Texas and Mr. Reavis asserts that the Attorney
General had his own banker appointed receiver of this company,
which is a legitimate competitor of the Texas Company and the H.
Clay Pierce oil interests.   Good legal talent has assured Mr Reavis
that the company has not in any way violated any State or Federal
statute.   The attorney General's own law partner was named as
counsel for the receiver.

"Weeks before the suit was filed, Mr. Reavis asserts he had in-
formation from the manager of the Magnolia that the company was
going to extend its business into Oklahoma territory, *which territory
is now controlled by Pierce and the Texas Company.   A survey for
a pipe line was started about two weeks ago and the next day the
suit was instituted.*

"This whole proceeding is quite Gates-like in its method and we
agree with the wideawake and public-spirited editor of the Fuel Oil
Journal when he says:

" 'There is absolutely no public sentiment behind the prosecution
of the Magnolia and Corsicana Companies.

" *'But there is behind it this combination:   The active efforts, the
influence, the scheming and the wire-pulling of two competitors of
the Magnolia Company; two competitors who want to see the Magno-*

*lia Company put out of business; two competitors who would be the
chief beneficiaries if this result were accomplished—which it will
not be.*

" 'This is the combination that constitutes the great moral force
behind the suit against the Magnolia Petroleum.   A spectacle to
make the gods weep.'

" ' Only a few weeks ago the then Attorney General of the United
States, Mr. Wickersham, discovering the fine Italian hand of one
of these competitors in the proceeding at Dallas by which indict-
ments were returned against the Magnolia Company and its officers,
ordered all the indictments dismissed because they were groundless.'

*"The citizens of Texas should ask a few questions touching the
remarkable zeal of the Attorney General of Texas in this case.—*
Financial World."

IV.   The fourth publication is an editorial published April 23,
1913, under the heading "Unfair Procedure in Magnolia Petroleum
Case."   It starts with the statement that the Beaumont Chamber
of Commerce had been considering the course of the Attorney Gen-
eral in throwing the Magnolia Petroleum Company into the hands
of a receiver pending the decision of the suit he had instituted to
oust it for alleged violation of the anti-trust law.   It then states
the views of such Chamber of Commerce, as disclosed by its resolu-
tion.   This is followed by a statement expressing surprise that the
commercial interests of the State have not manifested a greater
concern over the matter, and expressing the belief that the course
of the Attorney General must not only have a "tendency to injure
the State, but must have that consequence positively and most per-
ceptibly."   The writer then states in effect that under our anti-
trust laws corporations are exposed to the mercy of a single in-
dividual, and that so far as the News has been able to discover it
was not contended in the petition that the oil producing or selling
business was monopolized, but that on the contrary competition was
sharp, and that the chief, if not the only offense charged to the
Magnolia Company was that it was owned and controlled by the
Standard Oil Company.   The article then proceeds as follows:

"Whether this is true or not the News does not pretend to know.
Assume it is true, and yet it does not follow necessarily if common
sense is to guide our reasoning, that this would be a condition which
should greatly excite the people of the State.   For with the Standard
Oil Company, or one of its offspring, doing business in the State
side by side with one or more other companies not related to it,
we are assured of a more effective competition than we could be quite
certain of if it were not engaged in business here.   Indeed, *it is by
no means fanciful to suspect that it is the every effectiveness of this
company's competition that is the fundamental cause of its present*

*predicament;* that, in other words, *the Magnolia Petroleum Company is less the victim of its sins than of the jealousy of rivals, which would be glad indeed to be relieved of the competition it. subjects them to.*

"But one need not consider what are the probably intrinsic merits of the suit to perceive that there is a *summary and ruthless spirit* in the proceedings against it that would impose injustice on it even if it were guilty of more and graver offenses than the Attorney General charges to it. With very little notice, if practically any, the Attorney General prepares his petition, and hies him to his home town, and there before a friendly Judge has one of his neighbors appointed to take charge of the company's business and a million or more dollars' worth of its property. *This is essentially lynch law.* The company has the control of its own business and property wrested from it without having had any more opportunity to answer the charge made against it than is given to a suspected negro rapist. At some time in the future it will get a chance to reply; but when? Maybe in a year, more likely two, while it may count itself not unlucky if within three years it is able to get a final adjudication of the charges lodged against it. Meanwhile, it is denied the control of its own affairs, and must, as much if proved innocent as if proved guilty, sustain the loss of the fat fees and emoluments that will be pocketed by friends and neighbors of the Attorney General, to say nothing of that probably greater loss of business it is not unlikely to suffer.

"*The injustice of such a procedure is too palpable, flagrant and flagitious* to be denied by any one whose moral sense is not chloroformed by his prejudice against corporations. Indeed, to call such a procedure merely unjust is to flatter the ethical quality of it, *for it more nearly approximates the conduct of the highwaymen,* a fact which is not much obscured by the circumstances that it is done in the name of the State and by warrant of its laws."

The writer then argues that if the law permits such a procedure as he has discussed, it is a menace to all corporate capital, and that it should be revised. He argues further that certain laws are needed to punish individual directors whose acts oppress the people, and concludes as follows:

"*What we most preeminently do not need, and what we have the most urgent need to get rid of, is a law which enables one man aspiring to fame and office to terrorize a corporation, if for no other reason than that its form, complexion or affiliation is repugnant to his sense of corporate loveliness.*

V. This was an editorial published November 6th, 1913, under the heading "Hindering Texas with Spiteful Litigation." The opening paragraph is as follows:

"Mr. Looney's communication, which we printed yesterday, is both interesting and instructive. It was worth its space even in a paper having more than the ordinary run of "big news." One who reads it attentively will be at no loss to understand the spirit of the suit Mr. Looney has instituted against the Katy. Mr. Looney puts much stress on the fact that The News is published by a corporation. It can hardly be thought a very notable fact, since every newspaper in Texas of any consequence is published by a corporation, and that Mr. Looney is at such pains to emphasize it can only remind one *of the prejudice he has of all corporations, a prejudice that is a large part of his motive in suing the Katy.*"

This is followed by a discussion of a complaint made by Mr. Looney concerning a dispatch from Abilene with reference to the number of signatures to a petition to dismiss the suit against the Katy and an explanation with regard to how the erroneous dispatch came to be sent in. Then follows a statement concerning the receipt of copies of petitions and a statement of reasons why they were not published. The article then states that the facts mentioned refute the charges that the criticisms were actuated by ill-will or a desire to exaggerate the unpopularity of the suit. This is followed by argument to the effect that the News has not misrepresented Mr. Looney, and that the suit in the main was based upon allegations of a relation between the Katy of Texas and the Katy of Kansas which has been previously sanctioned by the State. A former suit is mentioned and it is stated that a certain extension was made by the Katy as a consideration for its dismissal. It is then contended in effect that Mr. Looney repudiated the acts of his predecessor. The writer argues that the relation between the two roads had changed since the prior suit, but that the change more nicely conformed the management to the spirit of the Texas Law. He then criticizes the complaint of Mr. Looney concerning the consolidation by the Katy of certain roads, and states that the Legislature validated the consolidation, and argued that such lines were not parallel, and that there was not sufficient competition to be perceptible. The article then proceeds as follows:

"Mr. Looney says that if the News imagines it can, by criticising him, cause him 'to weaken in the discharge of his duty,' or that it can 'poison the minds of the public and prejudice jurors against this litigation' it has 'descended to the contemptible level of a common jury-fixer' and is doomed to failure. We credit Mr. Looney with enough legal knowledge to know that the issues involved in this suit will not be resolved by jurors, but by Judges sitting on high benches, and we are less fearful than apparently he is that these Judges will be influenced by popular discussion of those issues. The News has denounced the bringing of this suit because it believes it to be an

unrighteous suit and because it believes that the bringing of it does immense damage to the State. And if these reasons did not suffice to justify the criticism of The News, *it would find in the palpable animus of the suit a sufficient reason to justify much severer criticism than it has uttered.* This suit has neither occasion nor provocation. It is entirely gratuitous. Mr. Looney was not importuned by the public to bring it, there was no popular demand that it be brought. We doubt if a single individual asked him to bring it. Certainly The Railroad Commission did not request him to bring it, and it is peculiarly the function of that body to govern the conduct of railroads. It was manifestly the intent of the people in creating the Railroad Commission that that body should see to it that the railroads obey the laws. They meant that the Railroad Commission should be the authority to determine whether a railroad was evading or violating the laws sufficiently to warrant judicial proceedings against it, and hence, in bringing this suit on his own initiative, unbidden by the Railroad Commission, and perhaps without even advising it of his purpose, Mr. Looney himself has violated, if not the letter, at least the manifest spirit of the law.

"*One will not have to search far for the motives which have betrayed Mr. Looney into a course that is so radically at variance with his duty.* When Gov. Colquitt received the bill permitting the consolidations that Mr. Looney complains of he asked Mr. Looney for an opinion as to the constitutionality of the measure. Mr. Looney pronounced it unconstitutional. The Legislature, notwithstanding, repassed the bill, after it had been vetoed, by an overwhelming majority of its members. There were a good many to say, in a spirit of jest, that in repassing the bill the Legislature had not manifested much confidence in the Attorney General's legal opinion. The gibe went home. *Mr. Looney was palpably piqued.* He was immediately seized of the petty desire to vindicate his opinion by appealing his contention from the Legislature to the Courts. *If Mr. Looney's sense of dignity had not been made to suffer in this way we should never have heard of this suit. In fine, it was not a sense of public duty but one of wounded vanity, that moved him to institute this suit, and if there were no other reason, the puerile quality of the spirit which actuated him would abundantly justify a denunciation of a proceeding that is condemned by its injustice and its folly.*"

VI. The sixth publication was an editorial published December 1, 1913, under the heading "Costly Effort to Wreck the Katy Railroad." The opening paragraph is as follows:

"There are some who, while not in sympathy with the *effort* which the Attorney General is making *to wreck* the Katy Railroad, have protested that The News has exaggerated the consequence which the State must suffer *because of that wanton enterprise.* The fact is

that, instead of exaggerating the injury done to the State, The News has not even approximated that injury in anything it has said.''

This is followed by a statement of various plans for improvements which were claimed to have been abandoned by the Katy on account of the suit, and a statement to the effect that in no money market could the Katy have secured the millions it had planned to spend after the Attorney General has instituted a suit designed to take its life. The writer then states that ''this indubitable consequence of this *senseless* suit is a grievous injury to the State,'' but that it is only one item in a bill of damages the State will have to pay. He then states that the credit of all other railroads is likewise impaired, and argues that if the Katy sins in suffering itself to be owned by an alien corporation, there are several other railroads guilty of the same sin, and that if duty required the Attorney General to bring that suit, duty would not excuse him from suing the others. He then proceeds as follows:

''Indeed, there are considerations which suggest that he is under a heavier obligation to attempt the wreckage of these other railroads than he was under to attempt to wreck the Katy. For, if the relation of the Katy of Texas to the Katy of Kansas is an illicit one, it long ago bought the State's condonation of that relation by building several hundred miles of line in consideration of the dismissal of the same complaint that the Attorney General now makes against it. Few if any of these other roads have done that. They have paid no fee, as the Katy has, for a license to do what the Attorney General denounces as a sin against our laws, and an Attorney General animated by that austere sense of duty which is incapable of making invidious distinctions *cannot content himself with wrecking merely the Katy. His indignation must vent itself no less destructively against these other corporations.*

''Whether the Attorney General's ambition has this wider and longer scope, The News does not pretend to know. It has heard not even an intimation *whether the debris he hopes to make out of the Katy* will make such a monument to political virtue as his ambition craves. But the fact that these other railroads are no less culpable than the Katy, *and that they are no less exposed to the fury of our Attorney General*, can have no other effect than to fustrate any plans which they, too, may have conceived for the extension and betterment of their lines. Every corporate enterprise, whether railroad or other, which requires alien capital for its promotion must suffer from the blight of this *insensate* suit against the Katy, and any one who would compute the damage which has been done to Texas by this proceeding against the Katy must add to the disruption of the Katy's projects the prejudice which has been engendered against not only every other railroad in Texas, but every corporation that

has grown large enough to excite the Attorney General's suspicions."

In each article the language claimed to be libelous is italicized.

The Justices of the Court of Civil Appeals agreed that each of the articles contained imputations tending to injure appellee's reputation, and that if the character of the publication must be determined with reference alone to Article 5595, Revised Statutes of 1914, each should be held to be libelous on its face. The majority, however, held that Article 5597 must be considered in connection with Article 5595 in determining whether language is libelous, and that if an article constitutes comment or criticism of official acts, the plaintiff must plead and prove that the same was unreasonable and unfair in order to make out a case. The majority further held that all imputations complained of constituted comment or criticism of official acts within the meaning of the statute, and that the same related to all of appellee's official acts in connection with the two suits, and further that as the record did not show fully all acts done by him with respect to the two suits, he failed to show that the imputations were unreasonable and unfair. The dissenting Justice is of the opinion that all of the articles except the Corsicana Resolution contained imputations not constituting comment or criticism within the meaning of the statute; that the Corsicana Resolution constituted comment or criticism, but that as such it was unreasonable and unfair; and that it was not a proceeding of a public meeting held and conducted for public purposes only.

The Court of Civil Appeals has certified for decision by the Supreme Court, the question, as to each of the publications, whether the language complained of renders such publication libelous on its face? In deciding this question, the following questions are necessarily or appropriately involved:

1. Was it incumbent upon appellee to prove that the matters complained of were not comment or criticism of his official acts within the meaning of the statute; or if comment or criticism, that the same was unreasonable and unfair?

2. Was the matter complained of in said publications privileged within the meaning of Subdivision 4 of Section 3 of the Libel Act of 1901, which Section is now Article 5597 · Vernon's Sayles' Civil Statutes?

3. Was the Corsicana Resolution the proceeding of a public meeting organized and conducted for public purposes only?

A determination of these questions involves a construction of certain sections of the original Libel Statute. Section 1 of this Statute (Article 5595 of Vernon's Sayles' Civil Statutes), reads as follows:

"A libel is a defamation expressed in printing or writing, or by signs and pictures, or drawings, tending to blacken the memory of the dead, or tending to injure the reputation of one who is alive, and

thereby expose him to public hatred, contempt or ridicule, or financial injury, or to impeach the honesty, integrity, or virtue, or reputation of any one, or to publish the natural defects of any one and thereby expose such person to public hatred, ridicule, or financial injury.''

Appellant contends that the above statutory definition of libel is qualified by Section 3 (Article 5597, Vernon's Sayles' Civil Statutes) of the Acts of 1901; and the portions thereof thus invoked and relied upon are as follows:

''The publication of the following matters by any newspaper or periodical, as defined in article 5595, shall be deemed privileged, and shall not be made the basis of any action for libel without proof of actual malice:

. . . . . . .

''3. A fair, true and impartial account of public meetings, organized and conducted for public purposes only.

''4. A reasonable and fair comment or criticism of the official acts of public officials and of other matters of public concern published for general information.''

Otherwise stated, it is the contention of appellant that Section 1 and Section 3 of the original Act are so interrelated and mutually dependent that both are to some extent involved in the definition of libel; and, as applied to this case, the contention further is that the matter complained of in the published articles is embraced within the protection of Subdivisions 3 and 4 of Section 3, above set out, and that before they can be pronounced libelous, the plaintiff must show that such alleged comment and criticism is not reasonable and fair.

In the case of Guisti v. Galveston Tribune, 105 Texas. 504, 150 S. W., 874, 152 S. W., 167, this court, in construing Section 1, said:

''We think it clear that in the enactment of the law the purpose was not only to make definite what constitutes actionable libel in this case, but to materially modify the doctrine of the common law upon the subject, . . . . so that we are constrained to hold that the manifest purpose of the Legislature in enacting this law was to cover the entire subject of libel as applied to civil actions, without regard to the rules of the common law and holdings of the court on the subject, and to materially enlarge the rights of those who may be the subject of libelous publications.''

We regard this as a perfectly correct holding, but in properly appraising the language there used, it should be borne in mind that the learned judge who delivered the opinion in that case was speaking of the enlarged rights of the plaintiff by virtue of Section 1, and that no question of privilege was involved. There is nothing in that opinion whch in any manner indicates that Section 3 was intended to qualify the definition of libel as given in Section 1, and the facts in that case nowhere call for such a construction of the statute.

Under the law as it existed prior to this enactment, if an article upon its face appeared to be libelous without any extrinsic aid, it was the duty of the trial court to so declare. If privilege was relied upon by a defendant, it was incumbent upon him to plead and prove the privilege, notwithstanding the judge-made law of privilege had been built up side by side with the judge-made law defining libel.

According to the common-law rule prevailing in England in cases of this particular character, the burden of proving that the words are comment, and that they are comment on a matter of public concern, rests on the defendant; and the modern English decisions hold that it is incumbent on the defendant to avail himself of the protection afforded by the law relating to such comment and criticism by a plea supported by proof.

In the case of Peter Walker & Sons v. Hodgson (1909), 1 K. B., 239, Buckley, L. J., said:

"In the present case the defendant made certain statements of fact, and from those statements of fact drew certain inferences, and upon these made certain comments. To prove his defense of fair comment it is essential, as I understand the authorities, *that he should first show that the statements of fact which he made were in their natural and ordinary signification true, and then that his comment upon them was fair and bona fide comment in a matter of public interest.*" (Italics ours).

To the same effect is the case of Kimber v. Press Association (1893), 1 Q. B., 65.

The New York Civil Code defines libel. Section 1907 of this Code also provides as follows:

"An action, civil or criminal, cannot be maintained against a reporter, editor, publisher, or proprietor of a newspaper for the publication therein of a fair and true report of any judicial, legislative, or other public and official proceeding, without proving actual malice in making the report."

In the case of Stuart v. Press Publishing Co., 83 App. Div., 467, 82 N. Y. Supplement, 401, the court in construing this statute expressed itself as follows:

"The articles (referring to the newspaper publications) being libelous *per se,* privilege is a defense to be pleaded and proved, and upon the defendant rested the burden of showing that the publication was privileged."

This case was quoted with approval and applied in the later case of Adolph Philipp Co. v. New York Staats Zeitung, 165 App. Div., 377, 150 N. Y. Supplement, 1053.

The California Code, among other things, defines libel as a false and unprivileged publication which exposes a person to hatred, con-

tempt, ridicule, etc.  The Code also very broadly defines a privileged communication.

In the case of Dixon v. Allen, 69 Cal., 527, 11 Pac., 180, the defendant contended that the plaintiff must both allege and prove that the publication charged to be libelous was not privileged.

The Supreme Court of California held that these statutory definitions did not enact any new rule of evidence, and that when language appears on its face to be actionable, and it does not appear that it is privileged, it is still presumed to be false and malicious, although the Code definition of libel uses the word "unprivileged." The court further held that no other evidence was needed to make out a *prima-facie* case than the publication itself when it met the requirements of the definition of libel found in that Section of the Code containing the definition, and that it was then incumbent upon the defendant, in order to defeat the case thus made, to show that the publication was privileged.  If this be a correct interpretation of the statute mentioned, which in defining libel expressly requires that a publication must be unprivileged in order to be libelous, it would seem to be an answer to the contention of appellant in this regard, even if it should be conceded that Section 3 of our statute is a part of or modifies the definition of libel contained in Section 1.

The California statute was again construed to the same effect in the case of Schomberg v. Walker, 132 Cal., 224, 64 Pac., 290.

The Georgia Code defines libel as a false and malicious defamation of another, expressed in print, writing, etc.  The same Code also defines a privileged communication.  The Supreme Court of Georgia, construing these provisions of their statutes, held that a publication coming within the statutory definition becomes actionable, and if published under circumstances justifying its classification as privileged, this would be a matter of defense.  Holmes v. Clisby, 118 Ga., 820, 45 S. E., 685.

Our statute does not say in terms nor by any just implication that comment and criticism of official acts by newspapers is privileged, but what it does say is that reasonable and fair comment or criticism is privileged.  We do not think the publisher is entitled to any *prima-facie* protecting benefits of the statute merely because it is shown that the language complained of comes within the field of comment and criticism.  If such comment and criticism on their face fulfill the requirements of the law found in the definition of libel as set out in Article 5595, above quoted, the plaintiff has, ordinarily at least, made his *prima-facie* case.  We do not think the defense of privilege under Subdivision 4 depends alone on the fact that it pertains to an official act of a public officer, but it depends also on whether the comment or criticism is reasonable and fair; and such matters, to the extent named in the statute, are placed in the category

of defenses.   To uphold appellant's contention, we would be compelled to say that whenever a publication comes within the realm of comment and criticism, it is immediately vested with the credentials of innocence and clothed with the presumption of fairness and reasonableness, and we do not think this is the law.

In construing our statute to determine what was intended by reasonable and fair comment or criticism as applied to acts of a public officer, it must be borne in mind that similar language had been frequently interpreted.

We think the great weight of American authority is to the effect that false statements of fact concerning a public man, or the imputation to him of corrupt motives, is not privileged as fair comment. Possibly this doctrine was never better stated anywhere than by the Supreme Court of Maryland in the case of Negley v. Farrow, 60 Md., 158, 45 Am. Rep., 715, where the following expression is found:

"There is a broad distinction between fair and legitimate discussion in regard to the conduct of a public man and the imputation of corrupt motives by which that conduct may be supposed to be governed; and if one goes out of his way to asperse the character of a public man and to ascribe to him base and corrupt motives, he must do so at his peril, and must either prove the truth of what he says or answer in damages to the party injured."

In the case of Hamilton v. Eno, 81 N. Y., 120, the publication charged a public official with having been improperly rewarded for making a certain official report.   The court said that as this report had been made public, an occasion existed in a qualified way to make comment upon it, and it became a subject of criticism as a matter of public interest and as the act of an official person.   This comment and criticism might deny the accuracy of the report and show that its reasons and conclusions were erroneous; and this might be done with satire and ridicule, so long as directed at the report itself, but such qualified occasion did not afford an excuse for an aspersive attack upon the character and motives of the officer, and to be excused for so doing, the defendant must show the truth of what he had said in that respect.   It would unduly prolong this opinion to cite or quote from the long list of other authorities in accord with the doctrine last above announced.

When we find that prior to the passage of our statute, by what was practically the unanimous voice of judicial expression, publishers of newspapers were placed on the same plane as other members of the community, with respect to libelous utterances, and that the liberty of the press meant merely that publishers should not be subject to antecedent censorship, and that the right to make comment on matters of public interest was not of the essence of privilege, strictly speaking, but partook rather of the nature of the inherent right of

everyone, and not the privilege of any particular one, we think it but fair to say that if it was intended or desired to make a radical departure from these rules, it should be done by legislative mandate, whose behest is unmistakable, and which bears no other reasonable interpretation; and that we ought not to construe the statute as contended for by appellant, in the absence of impelling reasons found in the language of the statute itself. Of course, this is a question of pure legislative intendment, and this court is not vested with the privilege or imbued with the desire to do otherwise than give it full effect, and if the meaning of the statute were in accord with appellant's claim, it would receive recognition to its fullest extent and to the exclusion of any inconsistent doctrine, and this court would be solicitous to so declare.

We believe it is permissible in arriving at the real intent of this statute to look to the history attending its enactment, and when this is done, and the light it affords is shed upon the statutory language, we think it has marked out with singular precision what the Legislature had in mind. The Journals of the two branches of the Legislature at the session when this Act was passed disclose that House Bill No. 29, printed January 19, 1901, contained these provisions:

"Sec. 2. The following shall be deemed privileged communications and shall not be made the basis of any action for libel, unless published through malice; and malice shall not be presumed by reason of such publication, but shall be proven as any other material fact and by a preponderance of the evidence.

"(3). A fair and true report of all public meetings and all legislative and judicial or other proceedings authorized by law and all statements made in the proper discharge of public or official duty published for general information.

"(4). A reasonable and fair criticism of the conduct *and motives* of public officials in their official capacities and of all officers in matters pertaining to their official duties." House Journal, 27th Legislature, 1901, pp. 113, 114.

This Bill failed of enactment.

Senate Bill No. 27, as amended and made subject to consideration in the Senate by special order on February 5, 1901, contained the following provisions:

"Sec. 3. The publication of the following matters by any newspaper or periodical as defined in Section 1 shall be deemed privileged, and shall not be made the basis of any action for libel without proof of actual malice.

"Second. A fair and true report of public meetings.

"Third. Reasonable and fair comments and criticism upon matters of public concern and the official acts of public officials published for general information." Senate Journal, pp. 148, 149.

This Bill, in substantially the form set out, seems to have passed the Senate on February 7, 1901. Journal, pp. 163, 165.

On March 21st the House amended the Senate Bill by striking out all subdivisions of Section 3 of the engrossed Bill after the words "without proof of actual malice," and inserted in lieu thereof the following:

"3. A fair, true *and impartial* account of public meetings *organized and conducted for public purposes only.*

"4. A reasonable and fair comment or criticism of the official acts of public officials and of other matters of public concern published for general information."

The Senate concurred in these amendments. Journal, p. 456.

The foregoing proceedings, found in the legislative Journals, are very persuasive that the Legislature declined to sanction a law authorizing attacks upon the motives of public officers. The same Act preserved to defendants all defenses existing at common law, but, as we have already indicated, we believe the correct common-law doctrine did not sanction the unfounded imputation of moral delinquency with reference to the private character of public officials or the motives which actuate their public conduct. To make a statement that a public officer is actuated by evil or corrupt motives in a public undertaking is to make a statement of fact, and such statement of fact should be justified like any other statement of fact, in order to exonerate the person making the statement. We believe that each one of the articles hereinbefore set forth contains matter which is neither comment not criticism, either at common law or within the meaning of the statute, and that such statements impugn the motives of appellee, and that in so doing they transcend the bounds of legitimate criticism and go into the zone of defamation. We therefore conclude that the trial court was correct in holding that each of the publications contained matter which had the injurious effect described in Section 1 of the Act, and which matter did not constitute comment or criticism within the meaning of Subdivision 4 of Section 3 thereof.

With respect to the proceedings of the Corsicana Chamber of Commerce, it will be observed from the history of this legislation above set out that the part which was finally crystalized into the form found in Subdivision 3 of Section 3 is much more restricted than as originally proposed, and is limited to public meetings organized *and conducted for public purposes only.*

Whether this meeting, under the facts presented to us, was a public meeting within the meaning of the statute, we need not, and do not, determine; but for the purposes of this opinion we shall assume that it was. That meeting had a perfect right to make reasonable and fair comment and criticism upon the official acts of the appellee,

and if its proceedings amount to no more than such comment and criticism, then they became harmless, and their publication was likewise harmless. If, on the other hand, these resolutions impute bad motives to the appellee, they would not be privileged as comment, and if thus libelous, their publication would not be excused when that ground of defense is invoked. It would be wholly inconsistent to hold the press responsible as a wrongdoer for doing one thing when it acted as a commentator or critic, and protect it as performing a high duty to the public when it did substantially the same thing as a purveyor of news. Assuming that this meeting was called for public purposes, yet when it ascribed to appellee reprehensible purposes, and charged him with a willful design in bringing his suit to seek a place where he might work out an injustice, it departed from the field of protection afforded by the statute, and was no longer engaged in the furtherance of public purposes, and the benefit of the statute did not extend to the publication of such proceedings.

We therefore answer that each of the publications was libelous on its face, and as the appellant did not offer to justify the truth of the libelous imputations the trial court did not err in holding that as to each the only issue to be submitted was one relating to the damages sustained by reason of the publication thereof.

Chief Justice CURETON and Associate Justice PIERSON took no part in the decision of this case, having certified their disqualification to the Governor, whereupon he appointed Hon. A. N. MOURSUND, of San Antonio, Special Chief Justice, and Hon. C. L. McCARTNEY, of Brownwood, Special Associate Justice, who, together with Associate Justice GREENWOOD, constituted the court rendering the above opinion.