## EXPRESS PUB. CO. v. LANCASTER.*
### (No. 7278.)

(Court of Civil Appeals of Texas. San Antonio. Feb. 11, 1925. Rehearing Denied March 11, 1925.)

**1. Libel and slander ⬤⇒112(2)—Malice may be inferred from reckless disregard of rights of others.**

Malice may be inferred from reckless disregard of rights and feelings of others and gross want of care.

**2. Libel and slander ⬤⇒101(4)—Burden on defendant publishing article charging officer with corruption to prove that comments were reasonable and fair.**

In action against newspaper because of alleged libelous article charging that a certain committee on vice had determined that plaintiff, chief of police, must go because of failure to suppress vice and crime, burden was on defendant to prove that comments and criticism of plaintiff were reasonable and fair, and thus privileged under Rev. St. 1911, art. 5597.

**3. Libel and slander ⬤⇒15—Sufficient if alleged libelous article tends to subject plaintiff to contempt or assails his integrity as officer.**

It was not necessary, to sustain an action by chief of police against newspaper for alleged libelous article, to show that plaintiff was charged with crime; but it was sufficient if article tended to subject plaintiff to contumely or contempt or assail his integrity and efficiency as an officer.

**4. Libel and slander ⬤⇒18, 120(2)—Newspaper article charging chief of police with corruption and failure to suppress vice held libelous; article held to show actual malice authorizing exemplary damages.**

A newspaper article stating that it was verdict of a private committee on vice that plaintiff, chief of police, must go, and that

charges of army officers as to corruption and suppression of vice by officials were true, which article had no basis in such report, which did not specifically name any officer, held to constitute a libel, under Rev. St. 1911, art. 5595, and to show actual malice, forming basis for exemplary damages.

**5. Libel and slander ⬤⇒19—Headlines of article might be libelous, while body thereof privileged.**

The headlines of an article might be libelous, while body of article is privileged, and whole libel might be included in headlines.

**6. Libel and slander ⬤⇒104(3)—Articles published subsequent to one on which action for libel based may be considered.**

Articles published subsequent to that forming basis of action for libel could be considered by jury in arriving at their verdict of actual malice on part of newspaper.

**7. Libel and slander ⬤⇒121(1)—$7,500 actual damages for libelous article, attacking plaintiff as chief of police, without knowledge of facts and without hearing, held not excessive.**

$7,500 actual damages to plaintiff, chief of police, for libelous newspaper article which attacked official character of plaintiff, charging him with corruption and suppression of vice, without knowledge of facts and without giving him a hearing, held not excessive.

**8. Libel and slander ⬤⇒105(3)—Witnesses may testify as to what impression they gained from reading of alleged libelous newspaper article.**

Where, in action for alleged libelous newspaper article, attacking plaintiff's official character as chief of police, where defendant alleged that articles subsequent to one on which action was based were not published of or concerning plaintiff, it was proper to permit witnesses to testify as to impressions made on them by perusal of such subsequent articles.

Appeal from District Court, Bexar County; Robt. W. B. Terrell, Judge.

Action by Fred H. Lancaster against the Express Publishing Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Denman, Franklin & McGown, Templeton, Brooks, Napier & Brown, Chambers & Johnson, and F. C. Davis, all of San Antonio, for appellant.

T. T. Vander Hoeven, B. A. Greathouse, and Lewright & Lewright, all of San Antonio, for appellee.

FLY, C. J. This is a suit instituted by appellee to recover damages based on an alleged libelous publication by appellant concerning appellee. Appellant answered by general demurrer and special exceptions, and general denial and pleas that the publications did not refer to appellee, and that each of them was privileged, published in good faith, and was true. The cause was sub-

mitted to a jury upon special issues, and upon the answers thereto the court rendered judgment in favor of appellee for $15,000.

The first article, among several named in the petition as containing libelous matter, was published on December 23, 1917, and was the only publication submitted to the jury, the court refusing to submit the other publications, and in regard to that publication the court only submitted the issue as to whether it was published with actual malice. The article in question follows:

"Two Local Officers Must Go, Verdict of Committee on Vice.

"Action to be Recommended to Mayor in Extensive Report to be Filed During the Present Week.

"Drastic Arraignment of Peace Officers Expected.

"After Month of Diligent Investigation Committee Finds That Charges of Corruption Made by Army Officer Are True—Threat of Martial Law if Conditions Are Not Remedied.

" 'The Chief of Police and the Police Judge of San Antonio must go.'

"That is the dictum of the citizens' committee of five business men appointed November 21 by Franz Groos, president of the Chamber of Commerce, to investigate vice conditions here. That action will be recommended to the Mayor in an extensive report to be filed this week by that committee, which consists of Edwin Chamberlain, chairman; Chester Terrell, secretary, and L. J. Hart, R. J. Boyle and W. W. Collier.

"The substance of the committee's report is that every charge recently made against the public officials of this city and county on November 21, by George J. Anderson, Director of the Law Enforcement Division of the War Department Commission on Training Camp Activities, is true. Conditions in this city, the report will say, are shameful and should not be tolerated longer. And responsibility for those conditions is placed on the police department. Blame will be placed directly on the Chief of Police and it is probable that later on other officers of the law will be included in the accusations.

"Edwin Chamberlain, chairman of the citizens' committee, said last night that San Antonio should be prepared for a shock and a shakeup. 'For one month our committee has been working almost daily,' Mr. Chamberlain said. 'We have gone into every nook and cranny of the situation here. We have had before us as witnesses representatives of the Department of Justice, the United States Marshal, captains of the city police and the military police. We have the evidence and our report will consist of cold, hard facts which nobody can refute and we have shown no favor in compiling our report. We will show no favor in making it.'

"Mr. Chamberlain was asked what he thought the Mayor would do about the report. His reply was: 'I cannot say as to that, I am inclined to think he will do his duty and clean up. I think the people of the city will demand that.'

"One of the moves seriously contemplated, not only by army officers but by representative citizens, if matters complained of are not immediately rectified, is to ask the Government to impose martial law on the city.

"The evidence taken by the committee will show that gambling, prostitution, and bootlegging have thrived here which could have been prevented. Mr. Chamberlain said last night that gambling had been pretty well suppressed, it seemed. Some good work had been done toward suppressing the activities of immoral women. But bootlegging seems to be thriving still.

"The committee expects the War Department to do just what it threatened to do if San Antonio was not cleaned up. The War Department threatened to remove the camps from around this city and permit no more to be established here. Already action has been taken in that direction. In a recent report made to the surgeon general by Lieut. E. W. Miller, it was recommended that work be stopped on Brooks Field, the new aviation school. Only intercession by business men who made favorable promises saved the field to the city. It was stated yesterday by high law enforcement officials representing the Government that almost immediate action would be taken by the War Department if, in case of an unfavorable report by the citizens' committee, the report was not acted on.

"One section of the committee's report to Mr. Groos that is favorable to the city as regards law enforcement efforts since the mass meeting November 21, is the testimony of Col. George A. Skinner of the base hospital that diseases caused by vice have decreased almost 50 per cent. in the last month.

"Two or three more depositions are to be taken by the committee before the report is filed. All testimony will be given in detail, giving names, addresses and citing actual instances of law violation.

"One of the most recent complaints of the military police in regard to the selling of liquor to soldiers is that two saloons, and one, especially, is such a large violator that guards have had to be placed in front of them to keep the bartenders from selling them liquors. An officer said yesterday that not only privates but officers had been taken out of one saloon in an intoxicated condition."

The jury found that the article published on December 23, 1917, was published and circulated by appellant with actual malice toward appellee and assessed the actual damages at $7,500, and the exemplary damages at $7,500. We find that there was evidence justifying a finding of actual malice in the publication of the article concerning appellee, and there was testimony to sustain the finding that appellee was actually damaged in the sum of $7,500. When the publication was made appellee was the chief of police and is one of the officers referred to in the publication.

The report of the committee referred to in the publication had not been made at the time, and only the conception and interpretation of a report which was to be made by

the committee were given. It was the assertion of appellant that "two local officers must go, verdict of committee on vice," and that "the chief of police and the police judge of San Antonio must go." The committee report had not been made at that time and appellant was anticipating and construing the expected report. The charges made were not the actual facts but the imaginary facts of the newspaper, which it was anticipated the report would contain. That "two local officers must go" as stated by the publication was not the "verdict of the committee." The publication was dated December 23, the report of the committee had not then been made, and the charges made by appellant could not have been based on any official report. On December 24 appellant speaks of the report being made in the future. It is not claimed in the answer that the charges were based on the report but on "a true, fair and impartial account of the meeting or meetings of the said committee appointed by the Chamber of Commerce or president thereof." It is claimed to be privileged because "made in good faith by defendant, purely as a matter of news and in the performance of its duty as the publisher of a newspaper.

The article upon which this suit is based is the same as was considered by this court in the case of Express Pub. Co. v. Wilkins (Tex. Civ. App.) 218 S. W. 614. After holding that the statutory definition of "libel" as given in Rev. Stats. of 1911, art. 5595, was intended to supersede all other definitions, it is held:

"In article 5597, however, of the libel law, four classes of cases are named in regard to which a publication shall be deemed privileged and shall not be made the basis of any action without proof of actual malice. The first includes proceedings in courts of justice or any other official proceedings authorized by law; the second, executive or legislative proceedings made a matter of record; the third, 'a fair, true and impartial account of public meetings, organized and conducted for public purposes only'; and fourth, 'a reasonable and fair comment or criticism of the official acts of public officials and of other matters of public concern published for general information.' With the first three clauses we are not concerned in this case, for the publication was not about proceedings in a court of justice or any official proceedings in the administration of the law, nor as to legislative or executive proceedings, nor as to any public meeting organized and conducted for public purposes only; but the publication, if libelous otherwise, can be justified only on the ground that it was a reasonable comment or criticism of the official acts of the appellee, or that it was a fair and reasonable comment on or criticism of a matter of public concern published for public information."

The evidence in this case is necessarily quite similar to that in the Wilkins Case, and it may be said in this case, as in that, that—

"The committee of investigation made no charges of corruption against the appellee. * * * The committee sustained the charge of corruption as to the city, but not as to the officers. * * *"

[1] The publication in this case is imputed to appellee in his official character, incapacity, misconduct, and a want of integrity, and can be justified only on the ground that it was a reasonable comment on or criticism of the official acts of the appellee or was a fair and reasonable comment on or criticism of a matter of public concern. Appellant was forestalling a report to be made by a committee appointed by a nonofficial body or individual, and putting its own construction on something that had not been given to the public. The undue haste with which comments and harsh charges were made and given publicity, before the report on which they were based had been made; the assertion that charges of corruption made by an officer were true, when there was an utter failure to show that any such charges had been made, and placing the responsibility for such corruption on appellee; and the reckless repetition day after day of the attacks— all go to show actual malice against the officers concerned, and justified the verdict of the jury. The publication showed, by its undue haste in anticipating the action of an unofficial committee and one which had no legal existence, an utter disregard of the rights of the officers assailed, and evidenced malice towards them. No opportunity was given to appellee to vindicate himself or exculpate himself from the anticipated report, but it was assumed that he was guilty and that he "must go" on a verdict of the "committee on vice." Without a hearing he was condemned, upon no evidence whatever, and he was held up for the scorn and contempt of every good citizen who condemns fraud or gross inefficiency in a peace officer. Appellee obtained a hearing only after he had been publicly condemned by the newspaper, and was duly acquitted of any charges made against him and was continued in office. Malice may be inferred from a reckless disregard of the rights and feelings of others and a gross want of care. Chronicle Co. v. Quinn (Tex. Civ. App.) 184 S. W. 669. As said in Newel on Slander and Libel (4th Ed.) p. 313, § 274:

"It is not necessary to render an act malicious, that the party be actuated by a feeling of hatred or ill will toward the individual, or that he entertain and pursue any general bad purpose or design. On the contrary, he may be actuated by a general good purpose, and have a real and sincere design to bring about a reformation of matters; but if in pursuing that design he willfully inflicts a wrong on others which is not warranted by law, such act is malicious."

It may be that appellant was moved and actuated by a high and noble desire to purge

and purify San Antonio of the fearful corruption alleged against it by the committee, but in such attempt at purification and cleansing the rights of individuals could not with impunity be ignored. The Constitution has hedged about the rights of the individual to life, liberty, and the pursuit of happiness, and has guaranteed to him the privilege of not being condemned without a trial before his peers, and he cannot lawfully be condemned and punished without being heard in his own defense, and no matter what high and noble purpose may be the actuating cause, the worst criminal cannot be legally condemned in an ex parte proceeding. These constitutional safeguards and others have since the World War been ruthlessly disregarded and trampled under foot in the name of pure and righteous enforcement of some pet law, but it should be condemned and a strict adherence to constitutional safeguards to person, reputation, and property demanded in the enforcement of any law set up by individuals or communities as a fetish, to which individual liberty and right must be sacrificed with unreasoning fanaticism. Individuals, under our institutions, must be presumed to be innocent until proven guilty, and no man or set of men has the right to take the law in hand and condemn without a hearing. The privilege of being heard in his own defense was not accorded appellee by appellant; but without evidence, upon a mythical charge of corruption, he was condemned and given discharge from office as his punishment. This disregard of individuals' rights evinced actual malice.

As said in an excellent opinion by a Special Supreme Court in Belo v. Looney, 112 Tex. 160, 246 S. W. 777:

"Our statute does not say in terms nor by any just implication that comment and criticism of official acts by newspapers is privileged, but what it does say is that reasonable and fair comment or criticism is privileged. We do not think the publisher is entitled to any prima facie protecting benefits of the statute merely because it is shown that the language complained of comes within the field of comment and criticism. If such comment and criticism on their face fulfill the requirements * * * set out in article 5595, above quoted, the plaintiff has, ordinarily at least, made his prima facie case."

[2] It devolved upon appellant to prove that the comments upon and criticism of appellee were reasonable and fair and this it failed to do.

[3, 4] It was not necessary, to sustain an action, to show that appellant was charged with a crime, but it was sufficient if the printed article tended to subject appellee to contumely, contempt, or reproach, or assailed his integrity and efficiency as an officer. In the language of the statute, the publication tended to injure his reputation and thereby exposed him to public contempt and ridicule and impeached his honesty and integrity, and that constituted libel. Rev. Stats. art. 5595: Guisti v. Galveston Tribune, 105 Tex. 497, 150 S. W. 874, 152 S. W. 167.

The conversation had by Carlos Bee with the Secretary of War in Washington, D. C., was both irrelevant and immaterial, and hearsay of the purest type, and was properly excluded.

The so-called "committee on vice" had no official standing, having been appointed by an individual citizen, holding no official position recognized by law, and however good its motives and high its aims, it had no power and did not claim to have the power which was stated it had in bold headlines, that of compelling two officers of the city of San Antonio to vacate their offices. They did not, they could not, render a verdict that "two local officers must go"; nor did they find "that charges of corruption made by army officers" were true. The publication did not satisfy itself with an indefinite charge that "two local officers must go," but it named the offices to which it referred, and stated: "The chief of police and the police judge of San Antonio must go." The inevitable conclusion arrived at from the publication was that they "must go" because the "charges of corruption made by army officer are true." It was clearly an imputation of want of integrity in the men holding the two offices, and the words were actionable in themselves. The report of the committee showed that they received no "specific information" from military headquarters, although they asked of Gen. John W. Ruckman, commanding the National Army of the Southern Department: "Reports as to general conditions, and any failure of local authorities to enforce law." The libelous charge about corruption in the officers being charged by any army officer seems to have had no basis in any authorized statement by any such officer. The committee disclaimed the intent to make personal charges against the two officers, the only charge being "that the chief of police is inefficient." And yet on the report of the committee charges of corruption were made by appellant. The committee had no legal existence, and no aid or defense can be drawn from their report. The publication was not concerning any court of justice, or any official proceedings in the administration of the law, nor was it as to any legislative or executive proceedings, nor as to any public meeting for public purposes only. It was a gratuitous comment on a report expected to be made by a committee with no legal existence, and the publication was not a fair prophecy of what the committee would report in the future. The very precipitancy and haste with which an anticipatory construction was placed upon a report by a committee without any legal existence showed little regard for the rights of appellee,

and the statement, as ·though ex cathedra, was made that "charges of corruption made by army officer are true." To whom did these charges of corruption apply? No other reasonable conclusion could be reached than that they applied to the "two local officers" who "must go." The publicity given the report even before it was made was unnecessary, and the very publication of matters that could be denominated privileged, with undue haste and continued asseveration of the charges, would render them libelous and raise an implication of malice. Newell, Slan. & Lib. p. 332, § 298. Appellee was suspended and in due time tried and thoroughly vindicated and restored to office by the properly constituted authorities of the city of San Antonio, in spite of the verdict rendered by appellant and the committee without lawful existence or authority. The evidence was sufficient to show actual malice and form a basis for exemplary damages.

[5] It is not necessary to reiterate the rule that the headlines of an article might be libelous while the body of the article is privileged. The whole libel might be included in the headlines. In fact, the dissemination of a libel is more effectually done through catchy and sensational headlines and scarehead comment than through the material in an article, because, as is well known, a majority of readers do not peruse the body of articles. It seems that the author of "San Antonio's Bit" read only the headlines of the publication.

[6] The articles published in successive editions of the paper of appellant, while they do not form the basis of the libel, could be and doubtless were considered by the jury in arriving at their verdict of actual malice on the part of appellant. The first article was based, not upon the report, because appellant had not seen it and had no knowledge of it, except from a hearsay statement made by a member of the committee. In disregard of the reputation that had been constructed through many years, day after day, without a hearing given to appellee, without the real facts, the reputation of appellee was mercilessly assailed. It is admitted that the author of the article entitled "San Antonio's Bit" had not read the report of the "vice committee," and yet in that article San Antonio as a city is cleared of any charge of corruption and her private citizens vindicated, and the libel uttered by the appellant was narrowed down to "such of the public officers who, having the power to enforce the law, do not enforce it. They have forfeited the right to claim that they are patriotic or that they are loyal to their government, for by supporting lawbreakers by their official nonaction, they are adhering to the enemies of the government and giving them aid and comfort and are guilty of moral treason." This communication harks back and throws light upon the article of December 23, and indicates the relentless and vindictive spirit in which the libelous article was given publicity. Undoubtedly "San Antonio's Bit" referred to appellee as ·well as other city officers, and charged him with "moral treason" against his country.

[7] The amount found by the jury as actual damages for attacking the official character of appellee, without even a knowledge of the facts, and without giving him a hearing, is not excessive. A man's reputation for integrity and uprightness built up, as was appellee's, through years of faithful and honest service, is not compensated for in dollars and cents, and such compensation at best is but poor satisfaction for the striking down of the work of a lifetime. The report of the unauthorized committee could form no basis for the libelous attack of the appellant, for its attack upon the official character of appellee was made before it had read the report of that committee, and while ignorant of its contents, appellant made the report its own and stood sponsor for it. There was a basis not only for actual but for exemplary damages. Nothing has been offered in mitigation of exemplary or punitive damages by showing the honest and excusable intentions of the publisher of the libel, nor has "any public apology, correction, or retraction" been made and published, in regard to the publication. Every publication since, in regard to the matter, has been a reiteration and intensification of the original article.

The damages are not so large as that it may be reasonably presumed that the jury did not act with a sound discretion but under the influence of passion or prejudice. There is no complaint of the manner in which the jury was chosen or that their conduct was in any manner reprehensible while considering their verdict. The size alone is invoked as evidence of passion or prejudice. We cannot say that it is so outrageous and unreasonable that it shocks the conscience of the court.

[8] It is the settled rule that witnesses should be allowed to testify, under circumstances shown in this case, as to what impressions they gained from reading the article, and under that rule the evidence of Algee and Bell was properly admitted as to the impression made upon them by a perusal of "San Antonio's Bit." Newell, Slander & Libel, p. 306, and pages 731–734, §§ 270, 669. Appellant had alleged that the article· "San Antonio's Bit was not published of or concerning plaintiff nor of or concerning any particular individual." It was the culmination of a series of articles about two city officers, and it was proper to show that readers of the article were impressed with the view that the article had in view the police chief and police judge.

The assignments of error are all overruled, and the judgment is affirmed.