## ENTERPRISE CO. v. WHEAT.    (No. 1300.)*

(Court of Civil Appeals of Texas. Beaumont. Dec. 13, 1926. Rehearing Denied Jan. 5, 1927.)

I. Libel and slander ⬿19—In libel action, newspaper headline, "severed head of slain woman placed at" defendant's cell, did not charge that sheriff unlawfully removed head from grave; "severed."

Newspaper headline, "severed head of slain woman placed at cell of defendant brings acquittal in murder case" *held* not to charge that sheriff, without authority, or unlawfully, removed head of deceased from grave, in sheriff's libel action against newspaper, since "severed" meant only that head was separated from body.

2. Libel and slander ⬿86(1)—Meaning of article, claimed to be libelous, cannot be enlarged by innuendo.

Meaning of article, claimed to be libelous, cannot be enlarged or extended by innuendo, so that innuendo must fail, if language of article, taken in usual meaning, is not reasonably susceptible of meaning sought to be given it.

3. Libel and slander ⬿7(1)—Article may be libelous, though not charging crime technically.

Language in newspaper article, to be libelous, is not required to charge violation of criminal statute in technical manner required in in-

---

⬿For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

ᵏWrit of error dismissed for want of jurisdiction March 2, 1927.

dictment or other criminal pleading, but need only allow ordinary mind, on reading it, to draw reasonable conclusion that party was charged with violation of criminal law.

**4. Libel and slander ⊙⟿49—Newspaper is not liable in sheriff's libel action for statement, in good faith, on probable cause for belief and without malice, that deceased's head was placed at accused's cell "in what is believed to have been" effort to break down accused's will.**

Newspaper article, stating in good faith and on probable cause for belief of its truth that head of deceased was placed at cell of accused "in what is believed to have been an attempt to break down" accused's will, *held* not to state as fact that it was placed there with such purpose, being mere comment for which paper would not be liable in libel action by sheriff in absence of actual malice, since it was conditionally privileged.

**5. Libel and slander ⊙⟿10(4)—Article, not charging sheriff with crime nor stating facts ground for his removal from office, was not libelous per se, in absence of malice.**

Newspaper article, which did not charge sheriff with commission of any crime nor state any fact by way of comment that would constitute ground for his removal from office, was not libelous per se, so as to render paper liable, in absence of malice, if untrue.

**6. Libel and slander ⊙⟿71—Common-law defenses to libel actions were not limited in any way by statute defining libel and prescribing defenses (Rev. St. 1911, arts. 5595, 5598; Vernon's Ann. Civ. St. Supp. 1922, art. 5597).**

Publishers' common-law defenses to libel actions were not restricted, modified, or limited in any way by Rev. St. 1911, arts. 5595, 5598, Vernon's Ann. Civ. St. Supp. 1922, art. 5597, defining libel and prescribing what defenses might be interposed as privileged or qualifiedly privileged matter.

**7. Libel and slander ⊙⟿51(5)—Question of good faith or probable cause for publication of newspaper article, libelous per se, is immaterial, where there was actual malice.**

Question of good faith or presence of probable cause for publication by newspaper of article, libelous per se, becomes wholly immaterial, where publication is prompted by actual malice.

**8. Libel and slander ⊙⟿49—Publisher cannot make untrue and libelous statements concerning official's acts and then criticize them, stating that he was actuated by corrupt motives.**

Newspaper or periodical may publish articles concerning official acts of public officials, but cannot make untrue and libelous statements concerning such acts, and then comment on or criticize them and state, as fact, that official was actuated by base or corrupt motives.

**9. Libel and slander ⊙⟿54—Where alleged libelous article was substantially true and truth was properly pleaded and proved, plaintiff cannot recover.**

Truth of any alleged libelous article, when pleaded and sustained by proof, is complete defense to plaintiff's cause of action, and statements complained of are not required to be literally true, it being sufficient if they are substantially true.

**10. Libel and slander ⊙⟿10(4)—Newspaper's incorrect statement that jury deliberated 25 minutes in murder case held not basis for damages in sheriff's libel action.**

In sheriff's libel action, newspaper's statement that jury deliberated only 25 minutes before reaching verdict in murder case *held* mere comment and harmless to plaintiff, though there was testimony showing that jury deliberated 45 minutes.

**11. Libel and slander ⊙⟿10(4)—Newspaper's incorrect statement as to length of time deceased's head was placed before accused's cell held not basis for sheriff's recovery in libel action.**

Newspaper's incorrect statement as to length of time that severed head of deceased was placed before accused's cell *held* not, of itself, to be basis of recovery in sheriff's libel action against newspaper.

Appeal from District Court, Liberty County; J. M. Combs, Judge.

Action by Allen Wheat against the Enterprise Company. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

Orgain & Carroll, of Beaumont, for appellant.

J. Llewellyn and P. C. Matthews, both of Liberty, for appellee.

HIGHTOWER, C. J. This suit was filed by the appellee, Allen Wheat, against appellant, the Enterprise Company, in the district court of Liberty county, to recover damages, both actual and exemplary, because of the publication by appellant in its newspaper, the Beaumont Daily Enterprise, an alleged libelous article of and concerning appellee as a man and citizen and public official. Appellee alleged, in substance, that the article complained of tended to injure his reputation and to expose him to public hatred, contempt, and ridicule, and to injure him financially, and to impeach his honesty, integrity, and virtue, both as a private citizen and as a public official. He further alleged, in substance, that the article complained of was false and was wrongfully and maliciously published by appellant, with intent to injure him in his reputation and good name, and to expose him to public ridicule and condemnation, and to injure him financially and politically, and that the publication of the article had that effect on him, both as a private citizen and a public official. He laid his actual damages at $35,000, and prayed for exemplary damages for $10,000.

The article published by appellant, which is made the basis of this suit, appeared in

the Beaumont Enterprise on the morning of the 24th of February, 1923, and the material portions of the article, including the headlines thereof, as well as the body, were as follows:

"Severed Head of Slain Woman Placed At Cell Of Defendant Brings Acquittal In Murder Case.

"Sam Boyd Found Not Guilty After Trial At Liberty.

"Jury Deliberated Only 25 Minutes after Hearing of Methods Used to Force Admission of Guilt.

"By Gus A. Flasdick, Staff Correspondent.

"Liberty, Texas, February 23—

"The head of Annie McShane, 21 years old, who was murdered on June 14, severed from her body and placed on a pedestal in front of Sam Boyd's cell in the county jail here, where he was awaiting trial for the murder, was believed to be responsible for the acquittal today.

"The jury returned a verdict of 'Not guilty' at 9:35 o'clock tonight, after 25 minutes' deliberation at the conclusion of a trial lasting two days, during which details of one of the most gruesome murders in the history of east Texas were brought forth. * * *

"Woman's Head on Pedestal.

"In what is believed to have been an effort to break down Boyd's will, a pedestal was erected in front of his cell window at the county jail upon which the head of Annie McShane and blood-stained middy blouse, which she wore at the time of the murder, was placed one day early in January. This was made known during the questioning of Sheriff Allen Wheat early this morning. Sheriff Wheat was not permitted to tell why the woman's head had been placed there and he was asked as to who did it.

"The case went to the jury at 9:30 p. m., after 26 witnesses had been heard and spirited arguments offered by both counsel for the state and for the defense. Hearing of testimony was concluded at 5:20 p. m., immediately after which Roy Pitts, county attorney of Polk county, who assisted in the prosecution in the absence of County Attorney P. C. Mathews, of Liberty, who is ill, addressed the jury.

"Mr. Pitts talked for nearly an hour. He pointed out that the case was not one of 'an in-between nature,' and that only acquittal or conviction with the death penalty could be returned.

"Defense Sums Up.

"After Mr. Pitts' address which consumed 55 minutes, court recessed for supper. At 6:45 the hearing was resumed and F. O. Fuller of Houston, defense counsel, took the floor. Mr. Fuller spoke for 1 hour and 10 minutes and his address was one brilliant oratory. * * *

"Mr. Fuller was followed by District Attorney Chap Cain, who conducted the prosecution. * * * At 9:30 o'clock Mr. Cain concluded his talk and the case went to the jury.

"An early verdict was apparently expected. Court attachés as well as spectators remained in their seats, and after 25 minutes a deputy sheriff announced that the jury had reached a verdict.

"Presents Hideous Sight.

"The head represented a hideous sight there before the barred window. It was placed there early one day in January and left standing until a few hours before the trial begun.

"The head was hardly more than a skull. The flesh which had not already fallen away had been scraped off and the bone itself washed. Sheriff Wheat was not asked as to who exhumed the head and placed it before Boyd's cell, or to what became of it afterwards."

Other portions of the article than that above quoted are entirely immaterial to any question before us, and will not be stated.

Though counsel for appellant present in their brief assignments of error challenging the action of the trial court in overruling several special exceptions attacking appellee's petition, and ordinarily it would be necessary in disposing of them to let the opinion show the pleading attacked, yet, since we have concluded that the appeal should be disposed of on the merits of the case, we shall not make any statement at length of appellee's pleading. Suffice it to say that appellee's petition contains all the usual and necessary allegations for a recovery of damages in a suit of this character. The meaning of the statements in the published article complained of, the petition undertakes to explain by innuendo, and this will sufficiently appear in our discussion of the questions involved.

Appellant answered by general demurrer, a number of special exceptions, general and special denial of each and all the allegations in plaintiff's petition, and then alleged that the publication complained of was privileged, in that the same was the report of a trial being had in the administration of justice in a court of justice, in which the general public was interested, and touching matters concerning the acts of a public officer; that the published article was a matter of public concern, published for general information, and that same was a reasonable and fair comment or criticism of the official acts of appellee, as sheriff of Liberty county; that all of the matters contained in the publication complained of were true, and that if not true, they were believed by appellant to be true at the time of the publication, and that, if not fully privileged, all of the article was conditionally or qualifiedly privileged, and it was not maliciously published, or made with malice, wrongful intent, or with any intent whatever to injure appellee, either personally or in his reputation as sheriff.

The case was tried with a jury and was submitted upon special issues. The trial court, after defining libel as defined by our statute, in so far as applicable to the facts

of this case, then proceeded to charge the jury, as a guide to them in answering the special issues, as follows:

"There is no proof of actual malice on the part of the defendant in the publication of the matter complained of, and in this connection you are charged that libelous matter, when published in a newspaper in a fair, true, and impartial account of the proceedings in a court of justice, is privileged under the law and cannot be made the basis of recovery in this suit; so, also, is privileged the publication of a reasonable and fair comment or criticism of other matters of public concern published for general information.

"Whether or not the publication complained of in this suit is libelous, and whether or not such publication is a fair, true, and impartial account of the proceedings had in the trial of the case of the State of Texas v. Sam Boyd, and whether or not such publication is a reasonable and fair comment or criticism of the official acts of the plaintiff, Allen Wheat, as sheriff of Liberty county, or of other matters of public concern published for general information, are matters for you to determine in response to the questions hereinafter submitted to you."

The special issues submitted were as follows:

"Question No. 1. Were the statements, or any of them, contained in the article and complained of by plaintiff in his petition, published in the Beaumont Enterprise, libelous as concerns the plaintiff under the definition of libel above given? Answer 'Yes' or 'No.' "

The answer to this question was "Yes."

"If you answer the foregoing question 'No,' that is, question No. 1 in the negative, you need proceed no further, but will return that answer into court as your verdict in this case, but if you answer same in the affirmative, then you will answer the following questions:

"Question No. 2. Were such libelous statements, if any, true? Answer 'Yes' or 'No.' "

The answer to this question was "No."

"If you answer question No. 2, 'Yes,' or in the affirmative, you need proceed no further but return your answer into court as your verdict in this case; but, if you answer said question 'No,' or in the negative, then you will answer also the following questions:

"Question No. 3. Was said article in question a fair, true, and impartial account of the proceedings upon the trial of the State v. Sam Boyd in the district court of Liberty county, Tex.? Answer 'Yes' or 'No.' "

The answer to this question was "No."

"Question No. 4. Were the matters contained in said article and which are complained of in plaintiff's petition, read in connection with the whole of said article, reasonable and fair comment upon, or criticism of the official acts of the plaintiff, Allen Wheat, as sheriff of Liberty county, Tex.? You will answer 'Yes' or 'No.' "

The answer to this question was "No."

"Question No. 5. Were the matters contained in said article and which are complained of in plaintiff's petition, read in connection with the whole of said article, reasonable and fair comment upon or criticism of matters of public concern published for general information? You will answer 'Yes' or 'No.' "

The answer to this question was "No."

"If you have answered the last three preceding questions, that is questions Nos. 3 and 4 and 5 'Yes,' then you need proceed no further; but if you answer all or either of said questions 'No,' then you will answer the following question.

"Question No. 6. Did the publication of said article result in injury to the plaintiff, Allen Wheat, either to his reputation or feelings, or both? Answer 'Yes' or 'No.' "

The answer to this question was "Yes."

"Question No. 7. If you answer the last preceding question, that is question No. 6, 'Yes,' then you will assess his damages, if any, at such sum, if paid now, as will fairly and reasonably compensate him for the injury, if any, which he may have sustained, if any as may be shown by the evidence as the direct and proximate result of the publication of said article, taking into consideration the injury, if any, to the reputation and feelings of the plaintiff, stating such sum, if any, in dollars and cents in response to this question."

In response to this question, the jury answered, "$15,000."

The court further told the jury that the burden of proof rested upon the plaintiff to establish the affirmative of questions Nos. 1, 6, and 7; and that the burden was upon the plaintiff to establish the negative of questions Nos. 2, 3, 4, and 5.

The court, in disposing of appellant's motion for a new trial, required appellee to enter a remittitur of $5,000, and then overruled appellant's motion and entered judgment upon the verdict in favor of appellee for $10,000, and from that judgment this appeal is prosecuted.

In order that the questions involved and our disposition of them may be clearly understood, it becomes necessary that we make a statement, in substance, of the material facts out of which this litigation grew and upon which this judgment rests, and we shall do so as briefly as we can.

About June 14, 1922, Annie McShane, a woman, was found dead at her home, near Cleveland, in Liberty county, and the indications were that she had been murdered. Shortly thereafter, Sam Boyd, mentioned in the article complained of by appellee, and his brother, "Tinker" Boyd, were accused of the murder of Annie McShane, and they were both arrested by appellee, as sheriff of Liberty county, and incarcerated in the county jail of Liberty county. "Tinker" Boyd was allowed bail, which he made, and although Sam Boyd was allowed bail, he was unable to make it and remained in jail and in appellee's custody until he was tried and acquitted of the offense of the murder of Annie McShane at the February term of the district court of Liberty county, 1923.

When the district court of Liberty county convened for its August term, 1922, Sam

Boyd and his brother, "Tinker," were jointly indicted by the grand jury for the murder of Annie McShane, and "Tinker" Boyd was again able to make bail, and did so, but Sam Boyd, being unable to make bail, remained in the county jail in the custody of appellee as sheriff of Liberty county, awaiting his trial upon the indictment.

At some time, not definitely shown by the record, while Sam Boyd was confined in jail, or, at least, after his arrest and while he was in the custody of appellee, he made a statement to the effect that "Tinker" Boyd killed Annie McShane by striking her on the head with a hammer, and that he, Sam, had nothing to do with the murder. This statement was either made by Sam Boyd to appellee or in some way appellee heard of it, and for the purpose of corroborating, if he could, the statement of Sam Boyd, that Annie McShane was killed by being struck on the head with a hammer, he conceived the idea and purpose of exhuming the head of Annie McShane, who had been buried some eight months before, to see if there were any marks upon the head indicating that she had been struck with a hammer. With this purpose in view, appellee consulted the district attorney of Liberty county to ascertain how he might lawfully proceed to exhume the body of Annie McShane and detach the head from the body. Thereupon, the district attorney, who was Hon. Chap H. Cain, advised appellee to consult the county judge of Liberty county and the district judge of Liberty county, and appellee did so, and all three of these officials told appellee to get the head, and, acting upon this authority, and also with the consent of the dead woman's father, appellee went to the grave of Annie McShane and dug in to the body and removed the head therefrom, and took it to the town of Liberty. He testified in this case, in substance, that he had no difficulty in removing the head from the body, as the body was so decomposed that all he had to do was to merely lift up the head and it came off of the body without the use of any knife or without any considerable effort on his part. Some few days after he had secured the head, Sam Boyd, then confined in the jail at Liberty, found out that appellee had the head in his possession and asked appellee to let him see the head, which appellee did. Appellee testified in this case that when he showed the head to Sam Boyd, he, Sam Boyd, stated to appellee that if appellee would put the head on a pedestal in front of the cell in which Sam Boyd was confined and dress it up with a bloody looking middy blouse, so as to make it look as nearly as possible like the middy blouse that Annie McShane wore at the time she was murdered, and if appellee would get "Tinker" Boyd and bring him

to the jail and let him see the head on the pedestal, with the bloody looking middy blouse, he, Sam Boyd, was sure that "Tinker" Boyd would be so overcome by the sight that he would break down and confess to being the murderer of Annie McShane, which he had all along theretofore denied. Appellee further testified upon the trial of this case that, acting upon Sam Boyd's suggestion, and also because he believed that "Tinker" Boyd was the guilty party, and that Sam Boyd was not, he had his deputy, a Mr. Patton, to take Annie McShane's head and fix it up on a pedestal, as suggested by Sam Boyd, with a bloody looking middy blouse, and to place it in front of Sam Boyd's cell, and that his deputy obeyed these instructions. The blouse was stained with red ink in such way as to make it look like it was stained with blood.

Right away, and as soon as he could after placing the head before the cell, appellee sent for "Tinker" Boyd or "Tinker" Boyd came to Liberty for some reason, and appellee told him, as he had been requested by Sam Boyd to do, that he, Sam Boyd, wanted to see him at the jail. Appellee testified in this case that he tried to get "Tinker" Boyd to go with him to the jail and cell where Sam Boyd was confined, but that "Tinker" declined to do so and stated that he would have his attorney go and see what Sam wanted. Thereupon appellee told "Tinker" that Sam did not want to see his, "Tinker's" attorney, but wanted to see "Tinker" in person, but "Tinker" still declined to go and never did go to the jail. Appellee testified upon the trial of this case that he placed the head with the middy blouse on the pedestal before Sam's cell for the purpose and with the intention on his part of breaking down the will of "Tinker" Boyd, if he could, and forcing him to admit that he was the murderer of Annie McShane, and that he thought that, when "Tinker" Boyd saw the head dressed up in the bloody looking middy blouse, as it had been adjusted on the pedestal, he, "Tinker" Boyd, would certainly be overcome and break down and confess the murder of Annie McShane. He further testified that he believed all along that "Tinker" Boyd was the man who murdered Annie McShane, and that when he agreed to Sam Boyd's suggestion relative to placing the head before the cell, he did so for the purpose of forcing in that way an admission of guilt from "Tinker" Boyd, although, as he testified, he already had enough evidence against "Tinker" Boyd to convict him.

Upon the trial of the criminal case of Boyd v. State, 100 Tex. Cr. R. 98, 272 S. W. 134, charged with the murder of Annie McShane, appellee was a witness for the state and testified, in substance, that he went

into the grave of Annie McShane, with the authority before shown, and secured the head from her body, as before stated, but he was not permitted by the court to testify why he placed the head upon the pedestal before Sam Boyd's cell in the jail. He was asked that question, but upon objection of counsel for the defendant, Sam Boyd, the court held that appellee's purpose in placing the head on a pedestal before the cell of Sam Boyd was wholly immaterial to any issue in that case.

In the argument of the case of Boyd v. State, his counsel, Hon. F. O. Fuller, stated to the jury repeatedly, in eloquent terms, so some of the witnesses say, that appellee had placed the head of Annie McShane with the bloody looking middy blouse upon the pedestal and set it before the cell of Sam Boyd to make him break down and confess that he was the murderer of Annie McShane The record also shows, without contradiction, that Hon. Chap H. Cain, district attorney, during his argument for the state in the Sam Boyd Case, stated and admitted that appellee had placed the head, dressed up as it was, in front of Sam Boyd's cell for the purpose of breaking down his will and forcing him to confess that he was the murderer of Annie McShane. Mr. Cain was a witness upon the trial of this case, and testified very clearly that he did admit and argue to the jury in the Sam Boyd Case that appellee placed the head of Annie McShane before Sam Boyd's cell with the intention and hope of forcing Sam Boyd to confess that he had murdered Annie McShane, and Mr. Cain, in that connection, testified that he believed that appellee had placed the head before Sam's cell for the purpose and with the intention on appellee's part of breaking down the will of Sam Boyd and forcing a confession of guilt from him, and that he, Mr. Cain, considered that appellee did nothing improper in placing the head before Sam Boyd's cell for such purpose, but, on the contrary, he, Mr. Cain, thought that it was creditable in appellee to do so, considering the horrible crime of which it was thought Sam Boyd was guilty.

The statements contained in the headlines of the article complained of and in the article, as a whole, which are chiefly relied on by appellee as being libelous, are:

(1) That appellee, as sheriff of Liberty county, unlawfully and without authority exhumed the head of Annie McShane, with the intention of placing it before the cell of Sam Boyd for the purpose of forcing from him a confession that he killed Annie McShane.

(2) That the placing of the head of Annie McShane before Sam Boyd's cell was done by appellee, as sheriff of Liberty county, for the purpose of forcing a confession from him that he killed Annie McShane.

(3) That the placing of the head of Annie McShane in front of Sam Boyd's cell resulted in an acquittal.

We have already shown above that the question of whether or not the statements complained of by appellee were libelous and the question of whether they were true was submitted to the jury, and they were found by the jury to be libelous and untrue.

Learned counsel for appellee have filed in this cause an exhaustive and ably prepared brief. They contend that the words, "Severed Head of Slain Woman Placed at Cell of Defendant Brings Acquittal in Murder Case," meant, by innuendo, taken in connection with other parts of the article, that appellee severed or permitted to be severed the head of Annie McShane from her buried body, and that he placed the same, or permitted it to be placed, at the cell of the defendant, Sam Boyd, and that his act in so doing was without authority of law, and that he was guilty of a violation of the Criminal Statutes of this state in so removing the head from the body of Annie McShane, and that, therefore, the article in this connection charged appellee with the commission of a crime, and that this being so, the article in this connection was libelous per se, and that it was false, and, that, therefore, appellee was entitled to recover actual damages against appellant, without proof of malice on appellant's part in publishing the article.

[1] We shall dispose of this contention briefly by saying that, in our opinion, the words complained of in this headline, either alone or taken in connection with the article as a whole, do not charge that appellee without authority of law or unlawfully removed the head of Annie McShane from the grave, as contended by able counsel for appellee. Certainly, the language employed in this connection does not, in terms, so charge, and we have reached the conclusion that the natural and ordinary meaning of the language complained of is not that appellee unlawfully or without authority of law exhumed the head of Annie McShane, and therefore the allegation by way of innuendo that the language complained of charged that appellee unlawfully and without authority of law removed the head from the grave cannot be sustained.

[2] It is the well-settled rule in this state, by the decisions of our Supreme and appellate courts, that the meaning of an article claimed to be libelous cannot be enlarged or extended by innuendo. If the language used in the article as a whole, when taken in its usual and ordinary meaning, is not reasonably susceptible of the meaning sought to be given it by innuendo, the innuendo must fail. Guisti et al. v. Galveston Tribune. 105 Tex. 497, 150 S. W. 874, and authorities there cited; Express Publishing

Co. v. Wilkins (Tex. Civ. App.) 218 S. W. 616, and authorities there cited. Counsel for appellee, in support of their contention that the article here complained of, if given its proper meaning by innuendo, charges that appellee, without authority of law and unlawfully exhumed the head of Annie McShane, cite the case of Koehler v. Du Bose et al. (Tex. Civ. App.) 200 S. W. 238. We have carefully read this cited case, and we have reached the conclusion that the language of the article there under consideration was very different and much stronger in favor of the plaintiff's contention that it charged the defendant with the commission of a crime than is the language here under consideration. In the Koehler Case, the written article complained of as being libelous of the plaintiff was by an individual, who wrote a letter to the state comptroller, protesting against the reissuance or renewal of a liquor dealer's license to a saloon keeper, and, in construing the alleged libelous article in that case, the court said that the natural and reasonable meaning of that article was to charge that the saloon keeper who desired a renewal of his license had been guilty of the offense of selling liquor to minors, and of permitting minors to enter and remain in the saloonman's place of business. We agree with the appellate court in its construction of the article in that case, because, when taken as a whole, the natural and reasonable meaning of the language there used was such that it conveyed to the ordinary mind, and that is the test, the idea or inference that the saloon keeper in that case had violated the criminal law of this state in permitting minors to enter his saloon, and also in selling to them liquor. No other construction of the article in that case could have reasonably been reached, for the very purpose of writing the letter to the comptroller was to let him know that the saloon keeper there had been guilty of a violation of the criminal laws of this state, and that for that reason he should not be further permitted to engage in the saloon business. But here, as we read the article complained of, that is the portion now under consideration, it does not, either in terms or by fair implication, charge any unlawful act or conduct on the part of appellee in exhuming and securing the head from the grave of Annie McShane.

[3] We are not unmindful of the rule in this state that the language used in an article, in order to be libelous, would not have to charge a violation of any criminal statute in such technical manner as might be required in an indictment or other pleading in a criminal proceeding; on the contrary, it would be sufficient to charge a violation of some criminal statute, provided the ordinary mind, upon reading it, would draw from it a reasonable conclusion that the complaining party was charged with a violation of some

criminal law. Counsel for appellee argue in this connection that the use of the word "severed" of itself, and especially when considered in connection with other portions of the article, was reasonably calculated to convey to the ordinary mind the impression that the dead woman's head had been unlawfully cut or by some unlawful force removed from the body. We cannot agree with counsel in this. When the word "severed" is given its usual and ordinary meaning, it implies no unlawful act, according to any authority that we have been able to find. The definition of the word "sever," as given by the Century Dictionary, is:

"To separate; part; put or keep distinct or apart.

"To separate from the rest; said of a part with reference to the whole or main body of anything; as to sever the head from the body.

"To separate; disjoin; referring to things that are distinct but united by some tie; to distinguish; discriminate; know apart.

"In law, to disunite; disconnect; part possession of."

We think that as the word "severed" was used in this article, either in the headline alone or when taken in connection with the body of the article, its meaning to the ordinary mind would naturally be that the head was separated from Annie McShane's body and removed from the grave, and that there would be no reasonable grounds for the impression upon the ordinary mind that the head was unlawfully separated or without lawful authority separated from the body. We therefore overrule the contention made by appellee that this portion of the article, either in the headline considered alone or when considered in connection with the body of the article as a whole, does charge, when given its proper meaning, by innuendo or otherwise, that Annie McShane's head was unlawfully or without authority of law exhumed, as contended by counsel for appellee.

[4] As to the contention of counsel for appellee that the article was libelous for the reason that it stated, as a fact, that the placing of the head of Annie McShane before the cell of Sam Boyd was for the purpose of forcing a confession of guilt from him, and that such statement was false, and therefore libelous, it is our conclusion, after careful consideration of the point, that the article, when given its proper construction as a whole or in any part, does not state, as a fact, that the head of Annie McShane was placed before the cell of Sam Boyd for the purpose of forcing a confession of guilt from him. The headline in that connection is, "Woman's Head on Pedestal."

This headline does not, of course, of itself state as a fact that Annie McShane's head was placed before Sam Boyd's cell for the purpose of forcing a confession of guilt from

him. Now, in the body of the article in that connection, we find this:

"In what is believed to have been an effort to break down Boyd's will, a pedestal was erected in front of his cell window in the county jail, upon which the head of Annie McShane and blood-stained middy blouse, which she wore at the time of the murder, was placed one day early in January. This was made known during the questioning of Sheriff Allen Wheat early this morning. Sheriff Wheat was not permitted to tell why the woman's head had been placed there, and he was asked as to who did it."

Now it will appear from the body of the article, following the headline in this connection, that the statement is that it is *believed* that the head was placed before the cell with the blouse, etc., for the purpose of breaking down the will of Sam Boyd and forcing a confession from him. This is not a statement of a positive fact by the writer of the article that the head of Annie McShane was placed before Sam Boyd's cell for the purpose of breaking down his will and forcing a confession from him, but, on the contrary, it is a statement by the writer of the article that it was believed that such was the purpose in placing the head before Boyd's cell. We therefore hold in this connection that this statement, headline and body of the article included, was nothing more than a comment by the writer indicating, perhaps, his own belief and that of others that the head of Annie McShane had been placed before Sam Boyd's cell with a view to breaking down his will and forcing a confession of guilt from him. Certainly, it was not the statement of any fact to the effect that appellee or any one else was guilty of a crime or any violation of law in placing the head of Annie McShane before Sam Boyd's cell, or that it was done with any corrupt or base motive on the part of the person who placed the head before the cell. In that connection, the act of placing the head before the cell, whoever did it, so far as appears from the article, was not even criticized for doing so.

[5] And if Allen Wheat, as sheriff of Liberty county, had placed the head of Annie McShane before Sam Boyd's cell for the purpose of breaking down his will and forcing a confession of guilt from him, his act in doing so would not have constituted a ground for his removal from office, and we do not understand counsel for appellee to contend to the contrary. Since this part of the article complained of as being libelous was not the statement of any fact charging appellee, as sheriff of Liberty county, with the commission of any crime, and since it was not the statement of any fact by way of comment or criticism that would constitute ground for appellee's removal from office as sheriff of Liberty county, it cannot properly be held that this portion of the article was libelous per se, and, if untrue, rendered appellant liable for damages, in the absence of malice. If this portion of the article constituted only a comment by the writer upon the official act of appellee, as we hold that it did, and if this comment was a reasonable and fair comment by the writer of the article upon the facts known to him, or believed by him in good faith and upon probable cause to be facts, then we hold, in keeping with what we believe to be the law in this state, that appellant would not be liable upon this portion of the article, even though appellee did not place the head in front of Sam Boyd's cell or cause it to be placed there for the purpose of forcing a confession of guilt from Sam Boyd. That it was believed, as stated in the article, that the head was placed before Sam Boyd's cell for the purpose of forcing a confession of guilt from him of the murder of Annie McShane is shown by the undisputed evidence in this case beyond all doubt. It is true that Sheriff Wheat, while a witness on the stand for the state in the Sam Boyd Case, was not permitted to say what the purpose was in placing the head before Sam Boyd's cell, yet the undisputed evidence in this record shows that it was strenuously contended by counsel for Sam Boyd in that trial that the head had been placed before his cell for the purpose of breaking down his will and forcing an admission of guilt from him, and it was frankly admitted, as the undisputed evidence in this case shows, by the district attorney in that case, Hon. Chap H. Cain, that the head was placed by appellee before Sam Boyd's cell for the very purpose of breaking down his will and forcing an admission of guilt from him, and the district attorney commended Sheriff Wheat in placing the head before the cell of Sam Boyd for that purpose. There was not a word of testimony introduced upon the trial of the Sam Boyd Case to indicate that the head of Annie McShane was placed before Sam Boyd's cell for any other purpose than to force a confession of guilt of the charge in that case. As we have shown above, Mr. Cain was a witness in this case, and testified, substantially, that he believed all along and throughout the trial of Sam Boyd that appellee placed the head before his cell for the purpose of forcing an admission of guilt by Sam Boyd of the criminal charge in that case, and that he had never heard anything to the contrary until after the trial of Sam Boyd. In addition to this, several of the jurors who sat in the trial of the case of Boyd v. State, charged with the murder of Annie McShane, testified, in substance, that they got the impression from the proceedings in that case that the head of Annie McShane was placed before Sam Boyd's cell for the purpose of forcing an admission of guilt from him of the murder of Annie McShane. How could the jurors have had any other impression, and how could the spectators in that trial have reached any other conclusion than that

the head of Annie McShane was placed before the cell of Sam Boyd for the purpose of forcing an admission of guilt of her murder from him? No reasonable mind, we take it, could have come to any other conclusion. The defense in that case was asserting that such was appellee's purpose in placing the head before Sam Boyd's cell, and was seeking to gain a favorable verdict from the jury on that ground, among other things. Counsel for defendant might well argue before a jury, as he did in the Sam Boyd Case, that the fact that the head of Annie McShane, fixed up and presenting the horrible sight that it must have presented, before Sam Boyd's cell, that if Sam Boyd had been guilty of the murder of Annie McShane, his will would have been overcome and he would have confessed, in all probability, to the murder of Annie McShane. And then the state's attorney, closing the prosecution in the Sam Boyd Case, came right along and frankly admitted, as the state's representative in that prosecution, that appellee had placed the head of Annie McShane before Sam Boyd's cell for the specific and only purpose of forcing a confession of guilt from him of her murder. Under such circumstances, and upon such undisputed facts and admissions, how could it be reasonably contended that the statement in the article, whether it be construed as the statement of a fact or merely by way of comment, that the head of Annie McShane was placed before Sam Boyd's cell for the purpose of forcing an admission of guilt from him, was not made in good faith and upon probable cause for the belief of the truth of the statement?

So we now might as well enter into a discussion of the legal principles that we think must control the judgment in this case, based as it is upon evidence which is wholly without conflict in any material respect.

[6] Prior to 1901, there was no statutory definition of a civil libel in this state, but our Twenty-Seventh Legislature enacted at that time legislation specifically defining libel in a civil suit. Laws 1901, c. 26. That definition, as contained in section 1 of the act, was as follows:

"A libel is a defamation expressed in printing or writing, or by signs and pictures, or drawings, tending to blacken the memory of the dead, or tending to injure the reputation of one who is alive, and thereby expose him to public hatred, contempt or ridicule, or financial injury, or to impeach the honesty, integrity or virtue or reputation of any one, or to publish the natural defects of any one, and thereby expose such person to public hatred, ridicule or financial injury." Article 5595, Revised Statutes 1911.

Such is still the unmodified statutory definition of libel in this state. Section 3 of that act reads as follows:

"The publication of the following matters by any newspaper or periodical, as defined in sec-

tion 1, shall be deemed privileged, and shall not be made the basis of any action for libel without proof of actual malice:

"1. A fair, true and impartial account of the proceedings in a court of justice, unless the court prohibits the publication of the same, when in the judgment of the court the ends of justice demand that the same should not be published, and the court so orders; or any other official proceedings authorized by law in the administration of the law."

Subdivision 4, § 3, of that act was as follows:

"A reasonable and fair comment or criticism of the official acts of public officials and of other matters of public concern published for general information."

The act concluded as follows:

"Nothing in this act shall be construed to amend or repeal any penal law on the subject of libel, nor to take away any existing defense to a civil action for libel, nor shall this act affect any suits now pending, or that may hereafter be brought upon a cause of action arising prior to the taking effect of this act."

In 1917 the Legislature of this state passed an amendment (Laws 1917, c. 206) to the Act of 1901, which was article 5598 of the Revised Statutes of 1911, reading as follows:

"Nothing in this title shall be construed to amend or repeal any penal law on the subject of libel, nor to take away any now or * * * heretofore existing defense to a civil action for libel, either at common law or otherwise, but all such defenses are hereby expressly preserved."

Now, it is the contention of counsel for appellee in this case that, since the enactment by the Legislature of this state of our statutory definition of libel, and providing what defenses a newspaper or periodical might interpose as privileged matter, no other matter is privileged, so far as a newspaper or periodical publication is concerned, than the matters named in the statute as privileged, and that these statutes, both as originally enacted in 1901 and as amended in 1917, had the effect to limit and restrict common-law defenses that were theretofore available to newspapers and periodicals when charged with a libelous publication. Counsel for appellant in this case contend, in substance, that the enactment by our Legislature of our statutes, defining libel and prescribing what defenses might be interposed by newspapers and periodicals as privileged or qualifiedly privileged matter, did not have the effect to restrict, modify, or in any manner limit publishers of newspapers and periodicals in any defense they had at common law, or otherwise, as to privileged or qualifiedly privileged publications. Counsel for appellant contend that the only limitation, if it be a limitation, upon the publishers of newspapers and periodicals, or upon publications made by in-

dividuals, could have reference only to the definition of libel, and not to any defense thereto that was open to such defendants prior to the enactment of our libel statutes. With this contention of appellant's counsel in this case, we, after full and careful consideration, fully agree. We think that even without the amendment of 1917, as shown above, this language contained in the original act of 1901 was itself a clear preservation of all existing defenses to any defendants in a libel suit that they had under any law prior to the enactment of 1901. Under the original act, to repeat this language:

"Nothing in this act shall be construed to amend or repeal any penal law on the subject of libel, nor to take away any existing defense to a civil action for libel."

But if there could be any reasonable doubt of the legislative intention as to the preservation of all existing defenses in libel suits at the time of the original enactment defining libel, including defenses to newspapers and periodicals, such doubt certainly was removed when the Legislature amended the original act in 1917, when it used the language:

"Nothing in this title shall be construed to amend or repeal any penal law on the subject of libel, nor to take away any now or at any time heretofore existing defense to a civil action for libel, *either at common law or otherwise, but all such defenses are hereby expressly preserved.*" (Italics ours.)

We are unable to see how this clear and imperative language preserving defenses in libel suits could be misunderstood or is even susceptible to judicial construction. The language of the Legislature as quoted is not that defenses existing before the passage of the act to individuals only should be preserved, but its only reasonable meaning is that defenses that existed by common law or otherwise, at any time prior to our legislation on the subject, were preserved to all defendants in libel suits. It was said by the court in Koehler v. Dubose (Tex. Civ. App.) 200 S. W. 238, that the effect of the amendment of 1917, above quoted, was to more explicitly reserve common-law defenses, and that such amendment cannot be deemed to be a legislative construction that the act of 1901 had deprived defendants of any common-law defenses. The court said in that case:

"It may be that the amendment was enacted to meet the fact that the part of the act of 1901 as to defenses was not inserted by the codifiers in the Revised Statutes of 1911. The fact that the part of the act in question was omitted from the statutes by the codifiers might create confusion and lead to the belief that a portion of the law had been repealed, and the Legislature deemed it essential or expedient to remove all doubts in connection with the matter. We hold that at no time since the enactment of the law of 1901 has any one, under proper circumstanc-es, been deprived of common-law defenses against libel."

In the case of Light Publishing Co. v. Huntress, 199 S. W. 1168, the Court of Civil Appeals at San Antonio, speaking through Chief Justice Fly and discussing the effect of the act of 1901, as to defenses in such suits that existed to any defendant prior to the passage of the act, used this language:

"The Legislature, in passing the law of 1901, evinced no intention or desire to destroy or impair any defenses, but rather to add to the same, so far as newspapers and periodicals were concerned, and also leave to them, as well as others, all defenses under the common law. In no uncertain terms it provided that:

"'Nothing in this act shall be construed to amend or repeal any penal law on the subject of libel, nor to take away any existing defense to a civil action for libel. * * *' Sec. 4.

"No one will question the fact that common-law defenses were 'existing defenses to an action for civil libel' at that time, and no such forced construction can be placed upon the plain language used as that it was intended to protect such defenses in pending cases or cases which arose before the enactment of the law. That is done in the last clause of the section, which provides that nothing in the act shall 'affect any suits now pending, or that may hereafter be brought upon a cause of action arising prior to the taking effect of this act.' The law means what it says that it shall not 'take away any existing defense to a civil action for libel.' The courts, since the passage of the law, have uniformly recognized the right of defendants in civil libel cases to interpose the defenses existing at common law. We have thoroughly discussed this question and further discussion is unnecessary."

And, further, from that opinion:

"The conclusions are reasonably deducible from the statute that the publishers of newspapers and periodicals are given certain special defenses to actions for libel, and that in addition all the common-law defenses are accorded to them and all other parties."

In the case of Express Publishing Co. v. Lancaster (Tex. Com. App.) 285 S. W. 810, our Commission of Appeals, Section A, speaking through Mr. Justice Powell, quoted with approval this proposition of law advanced by appellant in that case:

"A publication to be libelous must contain a defamation of the libelee in some of the ways named in the libel statute. If not privileged, the defamation imports malice. If absolutely privileged the defamation furnishes no ground for civil action for damages. If qualifiedly privileged in order to be made a ground for such action, it must be affirmatively shown by the libelee to have been made with actual malice toward him. Actual malice must be proven as a fact; it cannot be established by the defamation alone."

It is also clear from the opinion in the Lancaster Case that where the article complained of as being libelous is published upon a qualifiedly privileged occasion, and does not im-

pute to the plaintiff, a public officer, base or corrupt motives in doing the act charged by the article, or commented upon or criticised by it, and the charge is not so serious that, if true, it would afford grounds for his removal from office, and where it is shown that the article was not prompted by actual malice on the part of the publisher, but in good faith and upon probable cause for the belief of its truth, both as to the statement of fact or comment and criticism, the plaintiff in such case could not, at common law or under any rule announced in the adjudications of this state, recover damages by reason of the publication of such article. The authorities cited by the Commission of Appeals in that connection are Cotulla v. Kerr, 74 Tex. 89, 11 S. W. 1058, 15 Am. St. Rep. 819; Nunn v. Webster (Tex. Com. App.) 260 S. W. 157; Belo & Company v. Looney, 112 Tex. 160, 246 S. W. 777.

In Nunn v. Webster, 260 S. W. 157, it was clearly held by our Commission of Appeals, speaking through Mr. Justice Bishop, that the publisher of a newspaper sued for damages because of the publication by it of an alleged libelous article concerning the plaintiff, Webster, who was a public official and a candidate for re-election, might successfully interpose the defense that such publication was qualifiedly privileged because it related to the acts of a public official, and that, in the absence of a showing that the publication was prompted by malice on the part of the publisher, there could be no recovery.

In the Nunn-Webster Case, the trial court had peremptorily instructed a verdict for the defendant, but the Court of Civil Appeals (248 S. W. 711) held that the article complained of by Webster was libelous per se, and reversed the judgment of the trial court. The trial court had peremptorily instructed the verdict because of the absence of a showing by the plaintiff of actual malice on the part of the defendant. The Court of Civil Appeals in that case, among other things, said:

"Before the published matter under consideration can be classed as qualifiedly privileged it must be found that the facts stated in the body of the article are true."

The Commission of Appeals, in commenting upon this quoted language, said:

"If this be correct, there could be no such rule as qualified privilege. The showing under proper pleadings that statements claimed to be libelous are true is a perfect defense to a charge of libel. It is idle to say that one must show a perfect defense before he can avail himself of the defense of a supposed privilege."

The Commission of Appeals, after holding that the language complained of in that article amounted only to a comment and criticism of the official acts of Webster, the plaintiff, and that there was no proof that the de-

fendant was actuated by malice in making such publication, held that he could not recover even if the comment and criticism was untrue, for the reason that the occasion upon which the article was published was qualifiedly or conditionally privileged, and that being so, the burden was upon the plaintiff to show that its publication was prompted by malice. The Commission of Appeals in that case quoted with approval this language from our Supreme Court, in the case of Cotulla v. Kerr, supra:

"When a libelous publication relates to a person in office it may affect him in his personal or official character. If it relates to him personally alone it is governed by the same rules that apply to an individual. If it applies to him as an officer, the better opinion seems to be that to make it actionable per se the charge must be of such a nature that if true it would be cause for his removal from office."

Mr. Justice Bishop mentioned the fact that the decision in Cotulla v. Kerr was rendered prior to the enactment of our libel statute, but he said:

"The occasion being conditionally privileged in that the published article is in regard to Webster's conduct as an officer, we think this rule still obtains. As the charge applies to him as an officer, and is not of such nature as would be cause for his removal from office, it could not, as a matter of law, be said to be such defamation as would render plaintiff in error liable. And, before defendant in error could recover, the burden was on him to show that plaintiff in error was actuated by actual malice in publishing the article."

The court then quoted with approval the holding of the Commission of Appeals, Section A, speaking through Mr. Justice Sonfield, in the case of I. & G. N. Railway Co. v. Edmondson (Tex. Com. App.) 222 S. W. 181, as follows:

"The occasion being privileged, the presumption of good faith obtained. The onus was on plaintiff to overcome this presumption."

Then after citing as authority for the conclusion reached in the Nunn-Webster Case, Simmons v. Dickson (Tex. Com. App.) 213 S. W. 612; Cranfill v. Hayden, 97 Tex. 544, 80 S. W. 609; Railway Company v. Richmond, 73 Tex. 568, 11 S. W. 555, 4 L. R. A. 280, 15 Am. St. Rep. 794; Denver Publishing Warehouse Co. v. Holloway, 34 Colo. 432, 83 P. 131, 3 L. R. A. (N. S.) 696, 114 Am. St. Rep. 171, 7 Ann. Cas. 840; Hemmens v. Nelson, 138 N. Y. 524, 34 N. E. 342, 20 L. R. A. 440, the court concluded its opinion in the following language:

"The occasion here being conditionally privileged, and there being no evidence tending to show actual malice on the part of plaintiff in error, the trial court did not err in peremptorily instructing verdict in his favor."

The opinion of the Commission of Appeals in this case was adopted by the Supreme Court, but, as pointed out by counsel for appellee in this case in their brief, the Supreme Court did not state that they approved all the reasons of the Commission of Appeals for the conclusion reached. This being so, counsel for appellee here question the soundness of the holding in the Nunn-Webster Case by the Commission of Appeals, and say that it is very probable that the Supreme Court did not expressly approve the reasons for the Commission's holding in that case, because they were not satisfied with the soundness of same, but that the Supreme Court probably adopted the opinion simply because that court considered that the comments and criticism made of Webster's conduct in the article there under consideration amounted only to a fair and reasonable comment upon his official acts, in view of the fact that he was a candidate for re-election. We can hardly see how the Supreme Court could have adopted the opinion of the Commission of Appeals in the Nunn-Webster Case without agreeing to the reasons stated by the Commission. As to why the Supreme Court did not expressly approve the Commission of Appeals, we are not, of course, aware. The holding in the Nunn-Webster Case cannot be distinguished from the case at bar upon the ground alone, as suggested by counsel for appellee here, that that suit was one between individuals, and that, therefore, a discussion of our libel statutes limiting the defenses of newspapers and periodicals in libel suits was not called for. As a matter of fact, Nunn, the defendant in that suit, was the owner and publisher of a newspaper, and, while it is true the newspaper was not owned or published by a corporation, this fact could not, in our opinion, make any difference whatever. Again, counsel for appellee criticize the statement by the Commission of Appeals in the Nunn-Webster Case that the libelous article complained of by a plaintiff, which touches only a comment and criticism or statement of fact concerning official acts on his part, would have to be of such serious nature as to constitute a ground of removal from office, is not sound, and that the remarks to that effect by the Commission were unhappily and unfortunately made. It appears, however, that in Express Publishing Co. v. Lancaster, the Commission of Appeals, speaking through Mr. Justice Powell, as we have shown, supra, cited with approval this holding by the Commission of Appeals in the Nunn-Webster Case.

Counsel for appellee in their brief in this case cite the case of Galveston Tribune v. Johnson (Tex. Civ. App.) 141 S. W. 303, and also the case of Light Publishing Company v. Lewy (Tex. Civ. App.) 113 S. W. 581, as authority for their contention here that since the enactment of our libel statutes (article 5595, Revised Statutes of 1911, and article 5597, Vernon's Civil Statutes, 1922 Supplement) the defenses that might be interposed to a libel suit by a newspaper or periodical have been limited and restricted and are not as broad as they were at common law, or, perhaps, as they had been recognized to be by the decisions of our appellate courts rendered prior to the enactment of the statutes. In other words, counsel for appellee contend, in substance, that since the enactment of our libel statutes the published report by a newspaper of a proceeding in a court of justice must be true, fair, and impartial report of such proceeding, and that, unless it is absolutely so, the publisher cannot avail himself of the defense of privilege, even though the article published was, in good faith, believed to be true and was published without actual malice. They further contend that, since the enactment of our libel statutes, a comment or criticism in an article published by a newspaper or periodical concerning the official acts of a public official must be fair and reasonable, and that, if not so, the publisher thereof, if the article be libelous, is liable absolutely for actual damages sustained by the plaintiff, regardless of good faith on the part of the publisher and the presence of probable cause, and in the absence of any showing of actual malice prompting the publication.

It seems that the opinion of the Galveston Court of Civil Appeals, speaking through Mr. Justice Reese, in Galveston Tribune v. Johnson, supra, sustained these broad contentions here made by counsel for appellee. And it is true, as stated by counsel for appellee, that our Supreme Court denied a writ of error in that case. We cannot know, of course, just what our Supreme Court had in mind when the writ of error was there denied, but we have reached the conclusion, after a very careful investigation and consideration of the questions, that the opinion in the Johnson Case did not properly construe the effect of our libel statutes, and we think that the authorities already referred to in this opinion clearly show that the opinion of the Galveston court in that case has not been followed on the particular point here involved. We note in the brief of counsel for appellee that they say that the Johnson Case has been cited many times by the appellate courts of this state since it was rendered, and so it has, but not on the precise point here involved, so far as we have been able to find.

The Lewy Case, supra, was cited by Judge Reese in support of his conclusion in the Johnson Case, but we are of the opinion that the Lewy Case, upon the facts there involved, cannot be considered as authority for the conclusion reached in the Johnson Case. In the first place, the Lewy Case was a case that did not involve any proceeding in a court of justice, nor was it a suit by a public

official for the publication of an alleged libelous article by the paper concerning his official acts. It was a suit by Mrs. Cora Lewy, a widow, against the San Antonio Light Publishing Company for damages growing out of the publication by it of an alleged libelous article concerning her as an individual. The article upon its face, as the court held, almost in express terms charged that Mrs. Lewy had been guilty of the crime of smuggling goods into the United States from a foreign country, and that she had been detected in the crime and arrested by public officials for its commission. Upon the trial of the case, no proof was forthcoming to sustain this damaging charge, and Mrs. Lewy was awarded a recovery because of its publication. In the next place, in that case the very first finding made by the Court of Civil Appeals was that the publisher of the article was prompted by actual malice, as the jury had found, and, of course, upon such facts Mrs. Lewy was properly held to be entitled to damages.

[7] As said by Mr. Justice Powell, in Express Co. v. Lancaster, supra, the question of good faith or presence of probable cause for the publication by a newspaper of an article libelous per se becomes wholly immaterial where the publication is prompted by actual malice, and, although in the Lewy Case the Supreme Court denied writ of error, it could have done so upon the finding alone by the Court of Civil Appeals that the publication there was prompted by actual malice. We admit that there are some expressions in the Lewy Case, considered alone, that would tend to support the contention of counsel for appellee here, that, since the enactment of our libel statutes, common-law defenses theretofore existing in favor of newpapers and periodicals had been curtailed and limited, but when the decision in that case, as a whole, is construed in the light of facts upon which it rests, as all decisions should be, we are of the opinion that it does not support appellee's contention here.

Counsel for appellee also contend that, in the opinion of our Supreme Court in the case of Belo & Company v. Looney, 112 Tex. 160, 246 S. W. 777, their contention is sustained that appellee was entitled to recover in this case, without proof of actual malice, because, as they contend, the report of the trial of the Sam Boyd Case at Liberty was not a fair, true, and impartial account of that trial, as it related to the acts of appellee as a public official, and that because the comments and criticism, made in the article complained of, of the official acts of appellee, as sheriff of Liberty county, were not fair and reasonable. In other words, counsel argue that the decision in the Looney Case, at least by analogy, supports their contention here, that since the enactment of our libel statutes libelous newspaper and periodical publications are not privileged, either absolutely or qualifiedly, unless in the case of a proceeding in a court of justice the report be true, fair, and impartial, and unless in the case of comment and criticism upon the official acts of a public official the same be fair and reasonable. We do not understand that our Supreme Court in the Looney Case held that common-law defenses in libel suits that existed in favor of the publication of a newspaper or periodical prior to the enactment of our statutes had been, to any extent, restricted or limited. When that decision is carefully analyzed, we think, on the contrary, that our Supreme Court recognized that any defense that the publisher of a newspaper or periodical had under the common law, as properly construed prior to the enactment of our libel statutes, still exists. What our Supreme Court did hold in that case was that the articles, some six in number, complained of by the plaintiff, Looney, were upon their face libelous per se, and charged that Looney, who was then Attorney General of Texas, was actuated by base and corrupt motives when he filed certain suits in the courts of this state against certain defendants, and that the article clearly showed that these charges of corruption and base motives on the Attorney General's part were stated as facts, and that they impugned his honesty and integrity and were highly calculated to injure him in his reputation, etc. The court did not hold that at common law a newspaper might publish an article concerning the acts of a public official with impunity, provided only that the facts stated were true and that the comments made were fair and reasonable. The court, in that case, did not deny that at common law, as properly construed, prior to the enactment of our libel statutes, a newspaper might not publish an article concerning the official acts of a public official, in good faith and upon probable cause, although the publication was not true, without being liable for damages. The very gist of the holding in the Looney Case of our Supreme Court, as we read it, is that the published articles there under consideration charged the plaintiff, Looney, with gross official misconduct that was actuated by corrupt and base motives, and these charges were made as facts and not comment or criticism, and there was no proof forthcoming upon the trial to sustain any of such charges.

[8] It has always been the rule at common law, as construed in this state, that a newpaper or periodical might publish articles concerning the official acts of public officials, but under that rule they were not permitted to make statements of fact concerning the acts of such officials that were untrue and libelous, and then comment upon or criticize such acts and state as a fact that the public official concerned was actuated by base or corrupt motives in what he

did. Such was the holding in the Looney Case, as we construe it. We do not think that the opinion in that case can avail appellee anything here.

[9] If, however, we be incorrect in the views above expressed as to the effect that our libel statutes have had upon defenses that were open to newpapers and periodicals prior to the enactment of our statutes, yet we have concluded that upon the facts of this case everything that was published in the article complained of, whether it be a statement of fact touching the proceedings in the trial of Sam Boyd, or a statement of fact concerning the official acts of appellee, as sheriff of Liberty county, or whether it be the statements made in the article by way of comment or criticism of appellee's official acts, was substantially true as made, and was made in good faith by the publisher, and upon probable cause, and without malice toward appellee. This being so, appellee was not entitled to recover, and the court should have given appellant's requested peremptory instruction. The truth, when properly pleaded and sustained by proof, of any alleged libelous article is a complete defense to the plaintiff's cause of action, and it is not required to make it so that the statements and matters complained of be literally true. It is sufficient if they be substantially true. No authority is needed in support of this conclusion.

Now in this case, stated briefly, the undisputed facts show that appellee, as sheriff of Liberty county, did remove from the grave of Annie McShane her head and place it upon a pedestal before the cell of Sam Boyd in the county jail of Liberty county, dressed up as it was, for the admitted purpose of forcing, if he could, an admission of guilt on the part of "Tinker" Boyd to the murder of Annie McShane. Therefore it is not literally true that the head was placed before Sam Boyd's cell for the purpose of forcing a confession of guilt from him. But the occasion upon which that statement in the article was made being conditionally privileged, as we hold, and the statement having been made in good faith and upon probable cause, as all the evidence shows, appellant was not liable for damages, in the absence of a showing of actual malice, and there was none. There is no contention by counsel for appellee that there was any fact or circumstance introduced in evidence in this case that would have authorized the trial court to submit to the jury the issue of actual malice, and they do not, expressly or by implication, suggest in this court that the trial court was in error in expressly telling the jury that no actual malice had been shown. That there was probable cause for the statement in the article, that the head was placed before the cell of Sam Boyd for the purpose of forcing an admission of guilt from him, cannot be doubted. Every witness who testified in this case on that point stated that it was believed that Annie McShane's head had been placed before the cell for the purpose of forcing a confession of guilt from Sam Boyd. The only inaccuracy in the statement in that connection is that the purpose in placing the head before the cell was to force a confession from "Tinker" Boyd, instead of Sam Boyd, but this inaccuracy in the statement was made in perfect good faith and upon probable cause for its belief. Therefore we hold, under the authorities cited, that appellant was not entitled to recover for the statement or comment or criticism, whichever it be, as contained in the article, that Annie McShane's head was placed before Sam Boyd's cell for the purpose of forcing a confession from him.

We have already held against appellee's contention that the headlines of the article, "Severed Head of Slain Woman Placed at Cell of Defendant Brings Acquittal in Murder Case," did not charge, by innuendo or otherwise, that appellee was guilty of any crime under the law of this state in removing the head of Annie McShane from the grave, nor did it charge conduct of such a nature on appellee's part as would constitute a ground for his removal from office, and, in fact, being true, it cannot be the basis of a recovery by the appellee in this case.

[10]. The further statement complained of in the article, which was, in substance, that the jury trying the Sam Boyd Case deliberated only 25 minutes upon their verdict, we do not think that this was anything more than a mere comment, and, in fact, perfectly harmless to appellee. It is true appellee testified that the jury deliberated some 45 minutes before they reached a verdict of acquittal in the Sam Boyd Case, but this is a trivial and immaterial inaccuracy, and cannot, in our opinion, furnish any plausible contention for a recovery of damages by appellee.

Counsel for appellee, in their brief, say in substance, that if appellee placed the head of Annie McShane before Sam Boyd's cell for the purpose of forcing a confession of guilt of her murder from him, it was outrageous and cruel conduct on appellee's part, and that it would tend to injure his reputation and bring him into disrepute, and that it did so. It is not our province to make any comment upon appellee's actions in placing the head before Sam Boyd's cell. He thought, perhaps, in doing so that he was justified because of the enormity of the crime that he was investigating, yet appellee would have no more right to undertake by that means to force a confession of guilt of Annie McShane's murder from "Tinker" Boyd, although he was out on bail, than he would have had to undertake to force a confession of guilt from Sam Boyd. The only difference in the wrong, if any, would be in degree. Neither of such defendants could

legally be forced to confess guilt of the charge of murder against them, and, of course, it must have been the purpose of appellee to use the confession of guilt from "Tinker" Boyd against him, if he had succeeded in getting it, as it was planned to do. On this point, we think that the real gravamen of the charge contained in the article was as to the means adopted with the view on appellee's part to force a confession of guilt, and that it makes no material difference whether the confession was to come from Sam Boyd or "Tinker" Boyd.

[11] There is a further contention by counsel for appellee that the article complained of was false wherein it stated that the head was permitted to remain in front of Sam Boyd's cell from some time early in January until shortly before the trial of Sam Boyd, whereas, in truth and in fact, as he contends, the head was before the cell but a short while. Appellee himself, in this connection, testified that the head was put before Sam Boyd's cell one day, and that he tried on the next day to get "Tinker" Boyd to go to the jail where the head was, but failed, and that on the next day thereafter the head was removed. This would make approximately three days that the head was before Sam Boyd's cell. Appellee's deputy, Mr. Patton, testified, in substance, that the head was before the cell only two or three hours. We do not know, of· course, from this conflict, how long the head was before Sam Boyd's cell, but we think that this matter, of itself, could not be the basis of a ground of recovery by appellee, even though the head did not remain before the cell as long as the article stated.

In conclusion, we repeat that the undisputed evidence in this case shows that everything stated in the article complained of, and every comment or criticism, if there was any criticism, which we doubt, concerning appellee's official acts, were made in good faith and upon the belief that they were true, based upon probable cause for such belief, and, there being admittedly no proof of malice prompting the publication of the article, appellee could have no right of recovery, and the court was in error in declining to peremptorily instruct a verdict in favor of appellant, as requested. We have already protracted this opinion to too great a length, but, in view of the importance of the questions discussed, which we fully recognize, we deemed it proper to go at some length in stating the facts of the case and the principles of law governing these facts, as we understand them.

It results from the views expressed that the judgment against appellant should be reversed and here rendered in its favor, and such has been our order.